**HOME LOAN BANK BOARD et al. v. MALLONEE et al.**

**FEDERAL HOME LOAN BANK OF SAN FRANCISCO et al. v. FEDERAL HOME LOAN BANK OF LOS ANGELES et al.**

No. 12511.

United States Court of Appeals Ninth Circuit.

April 2, 1952.

Newell A. Clapp, Acting Asst. Atty. Gen., Holmes Baldridge, Asst. Atty. Gen., Edward H. Hickey, Donald B. MacGuineas, Joseph Kovner, Attys., Department of Justice, Washington, D. C., Walter S. Binns, U. S. Atty., Paul Fitting, Asst. U. S. Atty., Los Angeles, Cal., Verne Dusenbery, Portland, Or., Philip H. Angell, Robert M. Adams, Jr., San Francisco, Cal., Bishop & Hoffman, Los Angeles, Cal., Melvin H. Siegel, Minneapolis, Minn., Sylvester Hoffmann, Los Angeles, Cal. (Kenneth G. Heisler, William F. McKenna, Mose Silverman, Home Loan Bank Board, Washington, D. C., of counsel), for appellant.

Richard Fitzpatrick, Louis W. Myers, Paul Fussell, Pierce Works, Los Angeles, Cal. (O'Melveny & Myers, Bennett W. Priest and John Whyte, Los Angeles, Cal., of counsel), for appellee Federal Home Loan Bank of Los Angeles and certain of its member associations.

Westover & Smith, Los Angeles, Cal., for appellee Shareholders Protective Committee.

340

W. I. Gilbert, Jr., Los Angeles, Cal., for appellee Federal Savings & Loan Ass'n of Wilmington.

Raymond Tremaine, Los Angeles, Cal., for appellee Robert H. Wallis.

F. Henry NeCasek, Long Beach, Cal., for appellee George Turner.

Lyman B. Sutter, Long Beach, Cal., for appellee Title Service Co.

F. Henry NeCasek, Long Beach, Cal., for appellee Home Investment Co. of Long Beach and others, intervenors.

Charles K. Chapman, Long Beach, Cal., for appellee Long Beach Federal Savings & Loan Ass'n.

Before STEPHENS, HEALY and BONE, Circuit Judges.

BONE, Circuit Judge.

I

Appellants above named appeal from a Preliminary Injunction issued by the lower court enjoining (1) the Home Loan Bank Board, its members, and other persons and defendants from holding or participating in an administrative hearing which was on September 9, 1949 ordered by Home Loan Bank Board (by Order No. 2015) to be held in Washington, D. C., on October 25, 1949, and (2) the initiation of or participation in any administrative or judicial proceedings by any person in conflict with the alleged jurisdiction of the court below. The injunction on appeal was issued on December 1, 1949, in a proceeding which had been pending in the lower court since May, 1946 and which involved a veritable army of litigants and innumerable issues. The controversy really revolves around contentions raised in two major actions, and these actions drew within their orbit the issues and litigants above mentioned.

During the course of the litigation, and for convenience, the lower court consolidated these two major controversies into one action.

The Major Parties

For a better understanding of the complex pattern of litigation revealed in the long record on this appeal it is necessary to clearly indicate and emphasize at the outset the original contentions of the two major plaintiffs below because these first contentions clearly reveal the fundamental issues which precipitated the litigation and prolonged it to the present moment.[1] In referring hereafter to these two major contenders we use abbreviated terms to identify them and their actions. One of these actions is the so-called "Mallonee Case"; the other is the so-called "Los Angeles Action" and we will designate them as "Mallonee" and "Los Angeles," respectively.

By way of further identification the term "Mallonee" means the action initiated by a group of litigants who were (and are) shareholder-members of the "Long Beach Federal Savings and Loan Association" of Long Beach, California, a corporation organized and existing under and by virtue of the terms and provisions of the Home Owners' Loan Act of 1933, as amended, 12 U.S.C.A. § 1461 et seq., and which functions as a mutual thrift association in the City of Long Beach, California. In form, the Mallonee action was a "class-action" on behalf of the named plaintiffs who also claimed that in their suit they represented the interests of approximately 20,000 shareholder-members of the said Association who were similarly situated.

We hereafter refer to the Long Beach Federal Savings and Loan Association as "Association."

By reason of the virtual identity of interest existing between Mallonee and Association the contentions of the latter logically merged with those of Mallonee. So far as relief sought is concerned they may properly be viewed in this appeal proceeding as one party since they seek the same remedy. We now consider the contentions

1. These two major actions (Mallonee and Los Angeles) brought within their perimeter a vast number of subsidiary and ancillary claims which were injected into the litigation by means of interpleaders, cross-claims and the like. These minor matters represented conflicting claims to property rights associated with and thought to be affected by the outcome of property claims of the major actors.

of these major parties in the original complaints and pleadings which launched this extended litigation.

Prior to the issuance of the three Orders of the Federal Home Loan Bank Administration on March 29, 1946 (see text of Footnote 5, infra) the "Federal Home Loan Bank of Los Angeles" (herein called Los Angeles) was a body corporate, a Federal Home Loan Bank established by the Federal Home Loan Bank Board under authority and within the meaning of Chap. 11 of Title 12 of the U.S.C.A.

The first complaint of Mallonee was filed in the lower court on May 27, 1946 by Paul Mallonee and certain other shareholder-members of Association, and it named as defendants John H. Fahey, individually and as Chairman of the Federal Home Loan Bank Board; Ammann, individually and as purported Conservator for Association; Association, and several Does and Roes. In this action Mallonee demanded that Ammann (who had been appointed Conservator of Association on May 20, 1946 by the "Federal Home Loan Bank Administration" [2]) be

removed by order of the court. Among other matters the complaint charged in general terms that because Association had objected to a previous seizure of Los Angeles by the administrative officials of the Federal Home Loan Bank Board (thereby becoming unlawfully possessed of and interfering with property belonging to Association) the said administrative officials had unlawfully seized Association and named Ammann as Conservator thereof; that in this action the administrative officials were willful, wanton, malicious and vindictive, and acted illegally and without warrant of law; that the Conservatorship had caused large withdrawals of funds from Association; that the administrative officials had previously unlawfully seized possession of Los Angeles, to the injury of Association (a stockholder in Los Angeles) and its members. The relief sought was an adjudication of the "rights" of all parties to the Conservatorship transaction; an injunction which would, among other matters, forbid a merger of Association with any other organization and preserve (with immaterial exceptions) the status quo ante of Association,

2. "Federal Home Loan Bank Administration
"Order No. 5254
"Date May 20, 1946.
"Whereas, it has been determined that the Long Beach Federal Savings and Loan Association, Long Beach, California:
"Is conducting its business in an unlawful manner;
"Is conducting its business in an unauthorized manner;
"Is conducting its business in an unsafe manner;
"Has a management which is unsafe to manage a Federal Savings and Loan Association;
"Has a management which is unfit to manage a Federal Savings and Loan Association;
"Is pursuing a course that is jeopardizing the interests of its members;
"Is pursuing a course that is jeopardizing the interests of its creditors;
"Is pursuing a course that is jeopardizing the interests of the public;
"Is pursuing a course that is injurious to the interests of its members;
"Is pursuing a course that is injurious to the interests of its creditors; and
"Is pursuing a course that is injurious

to the interests of the public; and
"Whereas, it has been determined to be in the interest of said association, its members, creditors, and the public to appoint a conservator to take possession of said association and to conserve its assets pending further disposition of said association and its affairs:
"Now, Therefore, A. V. Ammann is hereby appointed conservator for the Long Beach Federal Savings and Loan Association, Long Beach, California, to take possession of said association and to conserve its assets pending further disposition of said association and its affairs; and, as such conservator, to have and exercise all of the powers and rights, enjoy all of the privileges, and assume and perform all of the duties and responsibilities of his office accorded or imposed by law, the Rules and Regulations for the Federal Savings and Loan System, and orders issued by the Federal Home Loan Bank Administration, or otherwise.
"I hereby certify that the above is an order issued by the Federal Home Loan Bank Administration on May 20, 1946.
"/s/ J. Francis Moore,
"Secretary."

and in addition, require Ammann to account to Association for all property received by him and Administration.[3] This pleading made no reference to an administrative hearing on the Ammann appointment.

3. Throughout this litigation the parties have loosely referred to the controlling administrative authority as "Board" and "Administration" and in a practical sense the appellations are interchangeable. This is made evident by an examination of the history of changes in the outward form of administrative control as related to the Home Loan Bank System. The changes in the legislative pattern of control have a bearing on the vital issues of administrative procedure presented in this litigation.

By Executive Order No. 9070, 7 F.R. 1529, 50 U.S.C.A.Appendix, § 601 note, issued and effective February 24, 1942 the President, under authority of the First War Powers Act of 1941, 50 U.S. C.A.Appendix, § 601 ordered that (among other things) the functions, powers and duties of the (then) "Federal Home Loan Bank Board" and of its members were to be administered by and under the direction of a National Housing Administrator. The "Agency" set up to "consolidate" the functions of the Federal Home Loan Bank Board (along with other agencies) was called the "National Housing Agency." The Order (No. 9070) preserved the then Federal Home Loan Bank *Board* as a "unit" within this new Agency, and the members of this *Board* were to "administer" *the functions and powers* of the Federal Home Loan Bank Board. The "unit" thus designated to so function was to be known as the "Federal Home Loan Bank *Administration.*" The *Chairman* of the then Federal Home Loan Bank Board "unit" was to serve as Federal Home Loan Bank *Commissioner* under this administrative set-up.

A reference to "Executive Order No. 9070" also makes plain that the agencies, functions, powers, and duties enumerated in sub-paragraphs (c) and (d) of paragraph 1 of Order 9070 were to be "administered" *in* the "Federal Home Loan Bank *Administration*"—these "agencies" being the "Home Owners Loan Corporation" *and* "The Federal Savings and Loan Insurance Corporation."

Order No. 9070 specifically provided that "all orders, rules, regulations, permits, or other privileges made, issued or granted by or in respect of any agency, function, power, or duty consolidated hereunder shall continue in effect to the same extent as if such consolidation had

As indicated above, Mallonee named Association as a defendant, obviously upon the theory that since Association was then under a Conservatorship and in possession and under control of the Conservator (Am-

not occurred until modified, superseded, or repealed * * *."

The "Federal Home Loan Bank *Administration*" continued to function under the administrative set-up above noted until its status was changed by "Reorganization Plan No. 3 of 1947" which became effective July 27, 1947, 12 F.R. 4981, 5 U.S.C.A. §§ 133y to 133y–16 note.

The foregoing will indicate the state of the law relating to administrative control under the Home Loan Bank System (including the Home Owners Loan Corporation *and* The Federal Savings and Loan Insurance Corporation) at the time this litigation was initiated in 1946, and this status remained until it was modified by Reorganization Plan No. 3 of 1947.

A memorandum filed with the lower court by Ammann at the outset of this litigation sets forth that at the time Executive Order No. 9070 was issued John H. Fahey was *Chairman* of the Federal Home Loan Board and that by virtue of this Order he became the *Commissioner;* that under the terms of the Federal Home Loan Bank Act, as amended, approved July 22, 1932, the Federal Home Loan Bank *Board* of five members was created and this Board invested with broad rule making powers, including the power to make rules, regulations and orders affecting the readjustment of Federal Home Loan Banks, Section 3, dissolution of Federal Home Loan Banks, Section 25, and liquidation or reorganization of such banks, Section 26; that in 1933 Congress authorized and directed the Federal Home Loan Bank *Board* to create the Home Owners Loan Corporation, Sections 1–4 inclusive, Home Owners' Loan Act of 1933, and under Section 5 of the latter Act to charter and establish *Federal* savings and loan associations (such as Association) and under rules prescribed by the *Board*, to organize and incorporate such institutions and provide for their examination, operation and regulation.

This memorandum filed by Ammann further set forth that the main function of the Federal Savings and Loan Insurance Corporation was to provide insurance of accounts for shareholders in Federal savings and loan associations (like Association) chartered by the *Board* (also similar insurance for certain state-char-

mann), it was thereby rendered legally impotent to defend itself against the actions of the administrative officials of Administration who were named as defendants because of their appointment of a Conservator.

By its first pleading Association "injected" itself into the Mallonee suit, this by way of an answer in the Mallonee action. In this pleading Association styled itself "defendant and third party plaintiff" and its pleading a "cross-complaint." This pleading was filed July 1, 1946, and it named and brought into the Mallonee action (as third party defendants) the three Federal Home Loan Banks of Portland, San Francisco and Los Angeles, the last named being the party we designate herein as "Los Angeles." As respects the said Home Loan Banks, Association demanded that there be an accounting of and return to Association of all its property of every kind then held by said banks. Among other matters Association demanded that the court determine and adjudge in which Bank Association was a stockholder, and also that all of the acts of Ammann, as Conservator, be invalidated as unauthorized, illegal and void.

The lower court made a formal order on July 1, 1946 in which it directed that the aforesaid three Home Loan Banks be made parties in the Mallonee action, reciting in this order that the three Banks were "necessary and proper parties to the complete and final determination of the above [Mallonee] action."

The pleadings of Mallonee and Association both had as their basic premise and contention the charge that the appointment of a Conservator for Association was an illegal act wholly without authority of law, as a consequence of which these parties had been deprived of their property without due process of law, or any process of law.

We shall later comment at length on the contentions of Mallonee and Association but, as we have noted above, their position on basic issues reflects a true identity of interest on all material matters. They have maintained a formal separation of their pleadings in various proceedings below and have filed separate briefs on this appeal, but any relief here granted will inure to the benefit of both.

An independent plenary action which we style "Los Angeles," was instituted on August 22, 1946.[4] It grew out of three Orders issued by the Federal Home Loan Bank Administration (hereafter called "Administration") on March 29, 1946. These Orders[5] liquidated and reorganized Los Angeles and "adjusted" and reorganized that

tered similar institutions); also that when an insured Federal savings and loan association went into default the Insurance Corporation would be appointed as its receiver in all cases for the purpose of liquidation; that the Act establishing the Federal Savings and Loan Insurance Corporation in no way amends the provisions of Section 5 of the Home Owners' Loan Act, whereby the Board is authorized to provide in its rules and regulations for the appointment of a conservator and for the merger, consolidation, etc., of savings and loan associations; that under these provisions of law and pursuant thereto, and specifically pursuant to Section 5 of the Home Owners' Loan Act of 1933, as amended, and the rules and regulations issued in accordance therewith, that Association was organized and chartered; that it was pursuant to rules and regulations of the Board and in accordance with the agreement (contained in the charter of Association) that the Conservator for

Association was appointed and under these rules an administrative hearing was ordered on the Ammann appointment, this hearing to be held on July 3, 1946 in Los Angeles, California.

The Ammann memorandum was filed as an argument in the earliest stage of this litigation (1946) but its summation of historical facts is valuable. We do not comment on its assumptions as to the scope and effect of the laws and rules and regulations referred to.

4. At this time Los Angeles was also a third party defendant in the Mallonee action by virtue of the order of the lower court made upon the filing of the first Association pleading on July 1, 1946. See reference supra in opinion re the filing of the first Association pleading.

5. "Federal Home Loan Bank Administration
"Order No. 5082
"Date: March 29, 1946.
"Whereas, it has been and is hereby determined that the efficient and economi-

branch of the Federal Home Loan Bank System operating in the Pacific Coast area of the United States which embraced the Home Loan Banks of, and located in, Portland, Oregon and Los Angeles, California.

cal accomplishment of the purposes of the Federal Home Loan Bank Act, as amended, will be aided by the action contemplated herein; now, therefore,

"It is hereby ordered that effective March 29, 1946, the Federal Home Loan Bank of Los Angeles shall be liquidated and reorganized and all assets and property of any kind or nature of such bank, including any unexpended amounts in approved and outstanding budgets and personnel but excluding officers and directors, are hereby transferred to the Federal Home Loan Bank of Portland and all the liabilities and obligations of such Federal Home Loan Bank of Los Angeles are to be assumed by the Federal Home Loan Bank of Portland and are hereby declared to be and become the liabilities and obligations of the Federal Home Loan Bank of Portland. The President of the Federal Home Loan Bank of Portland (hereinafter called Federal Home Loan Bank of San Francisco) is hereby authorized and directed to execute, issue or sign in the name of the Federal Home Loan Bank of Los Angeles or in the name of the Federal Home Loan Bank of San Francisco as the successor and legal assignee of the assets, property, liabilities and obligations of the Federal Home Loan Bank of Los Angeles such instrument or instruments as may be necessary or advisable and to cancel, assign or otherwise dispose of in whole or in part, any lease under which the Federal Home Loan Bank of Los Angeles has been bound or committed. All members of the Federal Home Loan Bank of Los Angeles are to become members of the Federal Home Loan Bank of Portland and the Federal Home Loan Bank of Portland (hereinafter called Federal Home Loan Bank of San Francisco) is ordered and directed to issue appropriate evidences of the ownership of all of the stock formerly held by the Federal Home Loan Bank of Los Angeles including stock purchased and held on behalf of the U. S. Government. The charter of said Federal Home Loan Bank of Los Angeles is hereby cancelled.

"It is further ordered and directed that effective March 29, 1946, the said Federal Home Loan Bank of Portland shall move and is hereby moved to the

In this suit Los Angeles named as defendants, Fahey individually and as Chairman of the Federal Home Loan Bank Board and purportedly serving as Federal Home Loan Bank Commissioner; also the

city of San Francisco, California, and shall be known hereafter as the Federal Home Loan Bank of San Francisco. Subject to the Federal Home Loan Bank Act, as amended, and the charter and by-laws of the Federal Home Loan Bank of San Francisco, including right of dismissal, said bank shall have as its directors, officers, employees, attorneys, and agents the directors, officers, employees, attorneys, and agents transferred, elected, designated, or appointed, to, by or for the Federal Home Loan Bank of Portland for the calendar year 1946 and shall operate under the charter and by-laws used by the Federal Home Loan Bank of Portland until duly changed.

"It is further ordered and directed that effective March 29, 1946, and until changed by the Board of Directors of the Federal Home Loan Bank of San Francisco and approved by the Federal Home Loan Bank Administration, the said Federal Home Loan Bank of San Francisco shall maintain a branch of said bank in the cities of Portland, Oregon, and Los Angeles, California.

"It is further ordered and directed that in order to provide for adequate representation of the states in the Federal Home Loan Bank of San Francisco region, effective August 1, 1946, the terms of all directors of said bank shall expire and that prior to July 1, 1946, a new election of directors shall be held. The terms of all officers of said bank shall expire upon the designation by the Board of Directors after August 1, 1946, of new officers and their approval by the Federal Home Loan Bank Administration. In such election and in future elections of the Federal Home Loan Bank of San Francisco the states of Nevada and Arizona shall constitute one state with the right of minimum representation to be alternated between each of said states within the rules and regulations and orders of the Federal Home Loan Bank System providing for a minimum representation from each state in a Federal Home Loan Bank district. On or before July 1, 1946, the Federal Home Loan Bank Administration shall appoint or reappoint four public-interest directors whose terms shall begin August 1, 1946, but shall end re-

corporate body called the Federal Home Loan Bank of Portland, "sometimes known and referred to as Federal Home Loan Bank of San Francisco"; also 16 Does. The complaint of Los Angeles was in two counts, a brief description of which seems necessary. Count one challenged the legality of the Orders above noted and charged that they unlawfully dissolved the Los Angeles Bank and transferred (its) lawfully held and lawfully possessed assets of a value in excess of $45,000,000, and its liabilities, to the Federal Home Loan Bank of San Francisco; that all actions taken under them were illegal; that these actions deprived Los Angeles of its property "without due or any process of law"; were a trespass and a fraud in law upon and an invasion of the constitutional rights of Los Angeles; cast a cloud upon the rights, titles and interests of Los Angeles in and to assets and properties of the Bank which at all times was being efficiently and economically operated with its affairs in a healthy and prosperous condition. It was further charged that all of the acts and things done by defendant officials of Administration were illegal, invalid and void and were part of a fraudulent scheme to deprive Los Angeles of its property, to abolish the Twelfth Federal Home Loan Bank District and to establish a new district without regard to the convenience or course of business of institutions eligible or likely to subscribe to stock in the Federal Home Loan Bank established within the (new) district, including all of the stockholders and members of Los Angeles; that the scheme of defendants was to compel members and stockholders of Los Angeles to become members and stockholders of the Portland Bank which had assets of less than one-third of those of Los Angeles.

Joining as parties plaintiff in the Los Angeles action were six members and stockholders in Los Angeles, these co-plaintiffs being six Federal Savings and Loan Associations (similar to Association) all located and doing business in Southern California. Their contentions appear in Count 2 of the Los Angeles complaint and these set forth generally that their "right to relief" arises out of the transactions and occurrences described in Count 1, all questions of law and fact being the same. Insofar as it concerns these six member associations Los Angeles is a "class action." One of these member associations filed a separate brief on this appeal.

All parties plaintiff in Los Angeles pray for sweeping relief, the granting of which would wholly nullify the Orders set out in

spectively December 31, 1946; December 31, 1947; December 31, 1948; and December 31, 1949.

"It is further ordered and directed that the Federal Home Loan Bank of San Francisco shall take such other action subject to the approval of the Federal Home Loan Bank Administration as may be necessary or desirable for the effective operation of the Federal Home Loan Bank of San Francisco.

"I hereby certify that the above is an order issued by the Federal Home Loan Bank Administration on March 29, 1946.

"/s/ J. Francis Moore,
"Secretary."

"Federal Home Loan Bank Administration
"Order No. 5083
"Date: March 29, 1946.

"Pursuant to Section 3 of the Federal Home Loan Bank Act, as amended, and the powers vested in me by law, the district of the Federal Home Loan Bank of Portland is readjusted and shall have added thereto the States of Arizona, California and Nevada, and the Territory of Hawaii.

"The said Federal Home Loan Bank of Portland is moved to San Francisco and shall be known as the Federal Home Loan Bank of San Francisco.

"I hereby certify that the above is an order issued by the Federal Home Loan Bank Administration on March 29, 1946.

"/s/ J. Francis Moore,
"Secretary."

"Federal Home Loan Bank Administration
"Order No. 5084
"Date: March 29, 1946.

"Pursuant to Section 25 of the Federal Home Loan Bank Act, as amended, and the powers vested in me by law the Federal Home Loan Bank of Los Angeles is dissolved.

"I hereby certify that the above is an order issued by the Federal Home Loan Bank Administration on March 29, 1946.

"/s/ J. Francis Moore,
"Secretary."

Footnote 5 herein and completely restore the status quo ante of these associated plaintiffs.

On August 26, 1946 Los Angeles filed an answer to the Third Party Complaint of Association (above noted) in which Association had made Los Angeles a third party defendant. In this pleading Los Angeles admitted all of the material contentions of Association save and except to deny that the Federal Home Loan Bank of San Francisco was a validly created Federal Home Loan Bank or that it existed at any time under or by virtue of the laws of the United States. Los Angeles also averred that the name San Francisco was but a name under which third party defendant Federal Home Loan Bank of Portland had been purportedly transacting business since on or about March 29, 1946 (the date of the challenged Orders).

On August 26, 1946, Los Angeles filed another pleading styled a "cross-claim" in which it named as cross-defendants Federal Home Loan Bank of Portland; Fahey, individually and as Federal Home Loan Bank *Commissioner* and as *Chairman* of the Federal Home Loan Bank Board. The averments in the pleading are lengthy and numerous. They recite the three reorganization Orders of Administration and challenge their legality and validity; assert that these Orders were the result and consummation of a plan and scheme to liquidate and dissolve Los Angeles and deprive it of and confiscate its property without notice or hearing and without due or any process of law; assert that the Portland Bank is not entitled to possession and ownership of the assets of Los Angeles; assert that the Orders abolish the Twelfth Federal Home Loan Bank District and establish a new district to the inconvenience of institutions eligible or likely to subscribe for stock in the Federal Home Loan Bank established within said (their) district including all of the stockholders and members of Los Angeles. Commissioner Fahey is charged with usurping the functions of the Board (Administration) without the concurrence or knowledge of any other member thereof in the making of the challenged Orders.

The prayer of this lengthy "cross-claim" is for an order declaring and adjudging the three Orders of Administration to be null, void and of no effect; that all of the property and property rights in controversy be restored to and title thereto be quieted in Los Angeles; that Portland Bank be ordered to execute and deliver possession of, and deeds and assignments to, property of Los Angeles in the hands of Portland Bank and render an accounting of acts and omissions done or omitted with reference to such assets. Los Angeles and its co-pleaders did not join in the motions of other appellees for the preliminary injunction which is the subject of the instant appeal. Nor were they parties to the initiatory proceedings which we describe in Part Two of this opinion since the first pleading of these litigants was not filed until August 22, 1946. These litigants at no time sought injunctive relief.

The problem of an administrative hearing on an agency order or orders, and judicial review thereof, is not urged as an issue in the Los Angeles case. That action proceeds upon an entirely different theory of law and for this reason it is necessary to indicate at some length its precise nature in order that its relation to the other actions (which were consolidated with it for trial) may be made plain. To this end we quote from the Los Angeles brief as follows:

"The complaint in the Los Angeles action accurately described its nature as being a 'Complaint to enforce legal and equitable claims to, to obtain possession of and to remove liens from and clouds upon title to, property and for other and general relief.' Jurisdiction was invoked under old Section 57 of the Judicial Code (then 28 U.S.C., Sec. 118, now 28 U.S.C., Sec. 1655) and under Sections 3, 12, 17, 25 and 26 of the Federal Home Loan Bank Act (July 22, 1932, 47 Stat. 725 et seq., 12 U.S.C., Secs. 1421–1499 [1449]); and the complaint alleged in terms that the activities complained of had operated to deprive these appellees of their property without due process of law, to cast a cloud upon their title and other

interests as to such property, and that the claims of the defendants with reference thereto were wholly without right. It was also alleged that the matter in controversy exceeded, exclusive of interest and costs, the sum of $45,000,000 as to the first (Los Angeles Bank) count and the sum of $14,000,000 as to the second (the five member associations) count. The prayer was in the conventional form of an action quasi-in rem to remove a cloud on title, to quiet title and to regain possession."

and

"The Los Angeles action is neither an action to enforce the charter of the Los Angeles Bank nor is it an action brought to review the actions of the commissioner evidenced by his Orders Nos. 5082, 5083 and 5084. It is, on the contrary, a plenary equity action in rem or quasi-in rem brought under former Judicial Code Section 57, in which the effect of the orders above referred to is drawn in question purely as an incident to the District Court's inquiry into title, ownership and the right to possession of the assets and properties constituting the res before the Court. In addition to this, and as an incident to its basic jurisdiction in rem, the Court has acquired jurisdiction in personam of the San Francisco Bank, the party in actual possession of the assets and properties in dispute.

"The activities of the commissioner leading up to the seizure of the demanded assets and properties are subject to judicial scrutiny.

"The orders of March 29, 1946, are not valid on their face, nor are they immune from attack by a showing dehors the orders themselves, that the seizure was unlawful, arbitrary and punitive in its nature."

and

"A reading of the complaint makes it perfectly obvious that all of the elements of the conventional cause of action in equity by an owner out of possession to quiet title, to remove a cloud on title and to regain possession are

present. Ownership and right to possession in the Los Angeles Bank down to March 29, 1946, deprivation of possession as of that date, an adverse claim under color of title (evidenced by the three orders as published in the Federal Register), plus the customary allegation that such claim is wholly without right, are all set forth.

"So viewed, and correctly viewed, the Los Angeles complaint is open to neither of the interpretations which appellants seek to put upon it. The action is purely and simply an equitable action quasi-in rem to try title as between one who alleges itself to be an owner out of possession—the Los Angeles Bank—and one who alleges itself to be an owner in possession—the San Francisco Bank. The latter claims, as its sole muniment of title, the three administrative orders of March 29, 1946, and particularly Order No. 5082, the purported instrument of transfer. The question presented, therefore, is whether or not the orders in question did or did not operate to pass title to the disputed assets and properties; a question which is present, generally as regards a deed or other instrument under which the defendant claims, in any quiet title suit or action to remove a cloud on title.

"This is certainly a question which the District Court has jurisdiction to determine, whether its ultimate decision be right or wrong. And the decision of this question calls for no species of review of the administrative orders, in the sense in which appellants use the term. The question is, not whether the orders should be set aside, in the administrative sense, but whether they, and particularly Order No. 5082, operated to transfer title to the San Francisco Bank. It is the contention of the latter that the orders did have this effect. It is the contention of the Los Angeles Bank that they did not; that from the standpoint of legal title the orders had no more effect than would a wild deed, executed in favor of the San Francisco Bank by a third party

(here the Commissioner) not connected with the title. These are questions for the District Court to determine, along with the other questions which appellants raise on this appeal, and none of which go to the jurisdiction of the District Court. All of these questions go to the merits of the key question below, which is: Did or did not the orders in question pass title to the demanded assets and properties? And it is certainly a novel experience to the writers of this brief that an appellate court should be asked to decide this question in advance of a trial on the merits."

### Subsidiary Actions

At this point we find it desirable to refer to three subsidiary litigants whose claims serve to shed significant light on most important aspects of this tangled litigation while it was still in its earliest stage. It was at this point that the litigation was set upon a decisive course from which it never deviated—a course followed in the face of vigorous protests registered by Administration, through Ammann.

### The Title Service Company Action

Title Service Company, a California corporation, was served as John Doe One in the Mallonee suit. Its answer and cross-claim in interpleader (filed June 4, 1946) recited that it is "engaged in a general escrow, acting as trustee under deeds of trust and real estate business," and that it had been named as trustee upon approximately 8000 deeds of trust conveying to it, as trustee, the legal title to the properties described in the said deeds of trust in which its co-defendant Association is named beneficiary; that the balance upon these deeds of trust is approximately $12,000,000.00. It is averred that all of the property covered by these escrows is situated in Los Angeles County, State of California.

The answer of Title Service Company further avers that Ammann, purporting to act as and with the authority of a Conservator, delivered to it 174 notes and deeds of trust securing the same, together with 174 requests for reconveyances and gave instructions to Title Service Company to reconvey said property described in said deeds of trust and to release said property from the further operation and encumbrance of said deeds of trust in which Association was named as a beneficiary; that Association had not executed instruments assigning and conveying title to Ammann but had advised Title Service Company in writing that Ammann and/or Fahey had no authority to act for Association, and that their actions were invalid and unconstitutional and were being attacked in the lower court (in the then pending Mallonee suit); that the answering defendant was thus faced with conflicting claims and found it necessary to file this cross-claim in interpleader to avoid a multiplicity of actions and prevent irreparable damage to it arising out of multiple liability upon obligations in favor of one of said other defendants.

In its prayer for relief, Title Service Company demanded that all defendants be required to interplead and litigate with each other their various conflicting claims to 174 trust deeds having a face value of $800,000 which had been deposited in the registry of the lower court; that this defendant be ordered to deposit in court the balance of the 8000 trust deeds; that this defendant be instructed and ordered by the court as to its rights and duties as such trustee, present and future, in its dealings with the Conservator and Association. (Appellants advise us that the officers and directors of Title Service Company and Association were then identical. By motion filed on June 28, 1946, Title Service Company also demanded an order of the court restraining the holding of an administrative hearing at Los Angeles on July 3, 1946, thereby joining Mallonee and Association in their demand for similar relief.)

### The Wallis Action

Robert H. Wallis, (sued by Mallonee as John Doe Two) filed his answer and cross-claim on June 12, 1946. Wallis had been acting as attorney for Association in its disputes with Administration and its deputies in connection with the alleged unlawful seizure of Association and Los Angeles and during the month of May, 1946 had received for attorney's fees and expenses a

cashier's check for $50,000 which he deposited in court when filing his answer in the Mallonee suit. In his answer and cross-claim Wallis asserted, among other matters, that Fahey and Ammann had attempted to use the appropriation (of Association) of $50,000 as a pretext to justify their seizure of Association from its management under the claim that Association had no right to use this money to defend itself; that Association desired that said money be used by Wallis for that purpose; that these claims are conflicting, and that this defendant found it necessary to file this cross-complaint in interpleader to avoid a multiplicity of actions, etc. The prayer of Wallis was for an order requiring all defendants except Association to set forth and present their claims to the said check and the funds its represents, and for said particular defendants to present their claims as to why the appropriation of the money for the services of Wallis was justification or ground for their seizure of Association; also that Association present its claim that Wallis be permitted to use said fund for the defense of Association; also that the various claims be litigated and that the court adjudicate said claims and instruct Wallis as to his rights and duties in respect to said check after which he be released and discharged of all responsibility and liability arising out of said check.

### Home Investment Company Action

Home Investment Company, a California corporation, is the third of the early interveners, first appearing in the Mallonee-Los Angeles litigation on July 1, 1946. It was not a movent in the preliminary injunction proceedings leading to the present appeal. In substance, it adopts the arguments of Association on this appeal. It intervened in the litigation to secure an order of court quieting title and to secure reconveyances of 174 deeds of trust, involving approximately $800,000 which had theretofore been brought into the proceeding by the answer and cross-claim in interpleader of Title Service Company, supra.

Home Investment Company is the borrower named in the 174 deeds of trust on deposit in the registry of the court and the record owner of the real property affected by these deeds. As indicated above, Title Service Company was the trustee thereunder and Association was the beneficiary.

We consider the legal posture of the pleadings of Wallis and Home Investment Company in Part Three of this opinion.

### II

In Part I we summarized some of the important contentions and issues raised in the initial pleadings of Los Angeles, Mallonee, Association, Title Service Co., Wallis and Home Investment Co. The claims for relief urged by Mallonee, Association and Title Service Co. were in the main identical; the last two parties named asserted claims of a subsidiary nature having their roots in the troubles of Association. Since the original injunctive relief demanded by Mallonee, Association and Title Service Co. was sought for the same purpose we hereafter refer to these three litigants as the Mallonee-Association group. Identical claims of Mallonee and Association may be referred to as those of Mallonee-Association.

We confine the discussion in this part of the opinion to procedures in the lower court which were the result of the original demands of the Mallonee-Association group which launched this litigation and we hereafter refer to this earliest period of the controversy as its "initiatory stage." The decisions then made by the court on the demands of this group (including their motions for injunctive relief based on their pleadings) reflect adoption of a theory which gave permanent course and direction to the litigation. We emphasize this fact because of its significant and controlling effect on all of the problems later injected into the case, including vital aspects of administrative law and judicial review of the acts of goverment agencies.

It should be emphasized that in the original actions and/or motions filed by Mallonee and Association and in the answer of Title Service Co., the question of an administrative hearing on the validity of the appointment of Ammann as Conservator of Association was squarely injected into the litigation and was thus before the lower

court. The length of the pleadings of these parties requires that we paraphrase the allegations concerning this particular matter.

Mallonee asserted in its first pleading (filed May 27, 1946) that the Acts of Congress under which Administration and Ammann acted did not provide for a judicial review of their actions; that the regulations adopted by these defendants which purported to give them the authority under which they "seized" Association and the delegation of legislative authority (under the Home Owners' Loan Act of 1933, as amended) to make and create rules and regulations for hearings and seizures, do not prescribe any rules, guides or controls for the proper exercise by an administrative official like Ammann, of the legislative authority so delegated; that the said regulations made no provision for any representative of the membership shareholders of Association to appear before the Board to have a determination of *their rights* considered; that the regulations and Acts under which they were adopted do not provide for any judicial determination of the truth or falsity of allegations made by Commissioner Fahey of the Home Loan Bank Board in making the seizure of Association and appointing Ammann as Conservator, or for determination of the validity of Ammann's acts. Based on this pleading and on other pleadings, motions, affidavits and records in the Mallonee action, plaintiff Mallonee filed a motion for a Preliminary Injunction to restrain the holding of an administrative hearing on the Ammann appointment. This motion and supporting papers were filed on June 20, 1946. We refer to this matter at greater length infra.

In its first pleading filed July 1, 1946, Association relied upon certain Acts of Congress, including the Home Owners' Loan Act of 1933, as amended, and as to these Acts, repeated the substance of the contentions of Mallonee. Association further alleged that the seizure of Association by Conservator violated the Fifth Amendment; that by Order No. 5309 (see text in Footnote 10) the defendants have pretended to hold a purported administrative hearing at which some person is to be authorized to take testimony in Los Angeles, California, which testimony is to be sent to defendant John H. Fahey and his subordinates for them to decide whether or not they were justified in seizing and attempting to destroy Association; that these defendants have already determined that their conduct was perfect despite the fact that it was inspired by malice, vindictiveness and spite, these defendants will use such administrative hearing for the purpose of further destroying and undermining confidence in Association and its management and if they are permitted by the court so to do they will cause irreparable harm, damage and destruction to Association; that Association is entitled to a fair and impartial tribunal such as the district court to hear, determine and pass upon *all* of the questions involved between Association and defendants, Fahey, Ammann, and their various deputies and employees. Association also alleged that the Acts and regulations under which all of the defendants purportedly acted were repugnant to and violated the provisions of the Fourth and Fifth Amendments.

The prayer of Association was that the defendants be enjoined and restrained from holding any administrative hearings for themselves, with particular reference to the purported hearing these defendants had set for July 3, 1946 at Los Angeles, California. (The issues thus raised on the question of an adminstrative hearing were considered by the Supreme Court in Fahey v. Mallonee, June 23, 1947, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030, which decision we later discuss.)

Ammann, Conservator of Association, (not named as a defendant by Los Angeles but present in California) was personally served with process in the Mallonee-Association group of actions. John H. Fahey, then *Chairman* of the Federal Home Loan Bank Board and serving at the time as Federal Home Loan Bank *Commissioner* was an inhabitant of the District of Columbia where (as "Chairman") his principal office was located in the City of Washington. He was never served with process

within the State of California, and at all times material to a consideration of the issues then posed by the aforesaid contentions, challenged the jurisdiction of the lower court to entertain the suits of these appellees and grant the relief they sought.

Contention as to failure of this attempted service upon Fahey, and absence of jurisdiction over him, was urged by Ammann through the United States Attorney at Los Angeles at all stages of the proceedings above noted. Other appellees named above sought to secure service of process on Fahey by resort to somewhat similar methods. Compare Blackmar v. Guerre, 72 S. Ct. 410.

The Mallonee action and the cross-claim of Association were filed as *in rem* actions to secure the return of property (all) *located in the State of California* and to remove a cloud on title thereto. The only attempt then made to serve any of the non-resident defendants was made outside the State of California. Service of the complaints in the consolidated actions designated as in rem actions was made pursuant to the order for service on non-resident defendants under Title 28, Sec. 1655. *The Federal Savings and Loan Insurance Corp.* with headquarters in the District of Columbia and which neither maintains an office nor has any agent or representative in the State of California, also was served only in the District of Columbia pursuant to a like order. Service of the so-called "cross-claim in interpleader" was made on the non-resident defendants purportedly pursuant to the interpleader provisions of Title 28, Secs. 1335, 1397, 2361.

Before proceeding to discuss an important problem of administrative procedure which was injected into this litigation at its inception, we refer to another matter which later became a controversial issue in the proceedings—the question of whether or not certain defendants residing out of the State of California ever made a general appearance in this litigation.

### The General Appearance Issue

The question of whether at any time appellants (other than Conservator Ammann and his official assistant or assistants then in Los Angeles) made a general appearance in this litigation is before us in the record and arguments of appellees on this appeal. They reveal that the lower court formally found (in its findings of fact accompanying the injunction order here on appeal) that in January of 1948 the (then) Home Loan Bank Board (see Footnote 3) made a "general appearance" in this litigation by filing its Order No. 388 which was dated January 17, 1948. It is not contended that Ammann, at any time prior thereto had purported to appear generally in this litigation for and on behalf of officials of Administration, the Board or the officials thereof (other than himself) these officials being referred to by the court as "the official defendants." Appellees rely on this so-called "general appearance" in 1948 contending that it establishes that *all* appellants did then and by this act generally appear and submit to the jurisdiction of the court. If this were true as a matter of law, it would not affect the status of the parties during the "initiatory stage" of the litigation here considered, although the contrary seems clearly implied by arguments of appellees.

For reasons hereafter appearing we do not regard the issue of effective service (or non-service) on Fahey or members of Administration as controlling in the initiatory stage of the litigation so far as concerns the problem of the propriety of the action of the lower court in entertaining the Mallonee suit, the cross-claim and answer of Association therein, and the interpleading cross-complaint of Title Service Company. The allegations in the initial pleadings of *these appellees* laid the foundation for, and the groundwork of, their immediate demand on the lower court for an injunction restraining an administrative hearing on the question of the legality of the appointment of the Conservator for Association, this local and preliminary hearing having been set before a "hearing officer" designated by the then Administration and directed to be held on July 3, 1946 at Los Angeles, California under Order No. 5309. This hearing had been called pursuant to a formal written request by Association

for such a hearing which was dated May 30, 1946 [6] (As we shall later note, the order setting this hearing is asserted by appellees to be a *final and judicially reviewable order of Administration.*) (See text of Order in Footnote 10.)

6. The written demand of Association for an administrative hearing on appointment of Conservator for Association reads as follows:

"Demand for Hearing pursuant to Section 206.2 of Rules and Regulations of Federal Savings and Loan System heretofore adopted by Federal Home Loan Bank Administration and by Other Governmental Authorities.

"To: Federal Home Loan Administration; Honorable J. Francis Moore, Secretary thereof; John H. Fahey, A. V. Ammann and Ray V. Dougherty, both individually and in whatever official capacities they, or any of them, may occupy.

"Answer and Demand for Hearing of Long Beach Federal Savings and Loan Association, Long Beach, California.

"Whereas, the undersigned, Long Beach Federal Savings and Loan Association has not, by its Board of Directors, or otherwise, consented to, or requested the appointment of, either a conservator or receiver, nor either of them, nor any other action, and

"Whereas, one A. V. Ammann did, on the 20th day of May, 1946, physically seize and wrest possession of said association, premises, assets, securities, bank accounts and books from the officers and members of said association, claiming to be empowered and authorized to do so by an Order purportedly made by the Federal Home Loan Bank Administration, as Order No. 5254, purportedly dated May 20, 1946, and purportedly signed by Ray V. Dougherty, assistant secretary, and

"Whereas, a copy of Order No. 5254 purportedly issued by the Federal Home Loan Bank Administration purportedly dated May 20, 1946, was received by an officer of said association on or about the 23rd day of May, 1946, and said association has made demand upon the said Federal Home Loan Bank Administration, John H. Fahey, A. V. Ammann and Ray V. Dougherty for a definite statement of grounds, reasons and causes of the purported seizure of the premises, assets, securities of said association, and

"Whereas, the said association, its officers, members, directors and other interested parties are unable to ascertain from a copy of said purported order No. 5254, from the said John H. Fahey, A. V. Ammann, Ray V. Dougherty, Federal Home Loan Bank Administration, or from any or all of them, any ground, reason, or justification whatever for the seizure of its said premises, and assets, of the purported appointment of the said A. V. Ammann as conservator of it.

"And Whereas, the said purported order No. 5254 contains no facts whatsoever justifying said appointment, but merely states 'unlawful,' 'unauthorized,' 'unsafe,' 'unfit,' etc., as grounds for such order.

"Now Therefore, as answer to said Order, said Long Beach Federal Savings and Loan Association denies each and every statement in said Order contained individually, separately and severally, and further alleges that said association is solvent and has at all times been, and now is, solvent and able to pay in full all of its memberships, shares, creditors, and all other obligations and in addition thereto had at the time of the said purported seizure by the said A. V. Ammann a surplus above all other obligations of approximately One Million Three Hundred Thousand Dollars ($1,-300,000.00).

"Said association further alleges that its business has at all times, prior to its seizure by the said A. V. Ammann, been, and was then, conducted in a proper, authorized, safe and fit manner, in no way injurious to the interests of any person whomsoever and in no way jeopardizing the interests of any person whomsoever.

"In addition, demand is hereby made for a hearing upon the matter of the purported appointment of said conservator and his purported seizure of possession and control of the assets, premises and securities of said association.

"It is respectfully requested that said hearing be held in the District of the Federal Home Loan Bank, of which said Federal Association is a member, to wit: Los Angeles, California, to which place of hearing (Los Angeles, California) consent is hereby given in writing.

"Said association further reserves the right to file a supplementary, amended or different answer, when (if ever) it has received definite charges, assertions, or allegations to which it can plead or answer.

"The undersigned Board hereby vehemently states that it has not at any time, nor will it ever consent to, or request, the appointment of any conservator, nor of any receiver, and that there

### An Administrative Hearing Is Enjoined

The clear and undisguised purpose of the Mallonee-Association group was to seek immediate injunctive relief at the outset of this litigation which would forbid recourse to and thereby by-pass the entire administrative process including judicial review of any final determination of Administration after the completion of the field hearing held at Los Angeles. It is of course obvious that if the court could be persuaded that no legal obligation rested upon it to require, or permit, resort to and exhaustion of the available and tendered process of administrative review *prior* to entertaining their actions and motions for an injunction, the only alternative was for the court to then proceed to adjudicate all of the issues and contentions presented by their pleadings and amplified in their motions for an injunction.

The court agreed with these appellees (as did a later called three-judge court in a supporting opinion reported in D.C., 68 F. Supp. at page 418 under the title of Fahey v. Mallonee) with a result we later discuss. And see Fahey v. Mallonee, supra.

We emphasize that this early technique of the Mallonee-Association group was obviously based upon certain assumptions, (1) that the order appointing the Conservator for Association was a final administrative agency order and being final, it was subject to judicial review then and there in the lower court, (2) that the order was issued without semblance of authority in law, (3)

that the said order *and* the order tendering and directing an administrative hearing on this appointment were futile, meaningless and useless gestures without legal significance or authority, (4) that the charges in the first pleadings, motions and arguments of the Mallonee-Association group of litigants sufficiently established that officials of Administration appointed the Conservator because they were *biased* and *prejudiced* in their attitude toward Association and motivated by *malice* toward its management and that these considerations were sufficient in law to call for injunctive relief against any and all attempts to require resort to the purported process of administrative review, and justified an adjudication by the lower court wherein the validity of the said orders could and would be finally determined in that court.

It is clear that the court accepted all of these postulates as sound legal gospel and entirely sufficient to justify its immediate issuance of an injunction (on July 1, 1946) which completely frustrated and thwarted all efforts to compel a prior resort to and exhaustion of administrative remedies. This restraining order recited, inter alia, "that to permit said administrative hearing to be held would constitute a duplication of actions and a multiplicity of suits for the hearing and determination of questions, issues and matters including constitutional questions now pending in this action before this Court, and would cause immediate and irreparable injury to Plaintiffs and others * * *." The defendants were restrained

---

are not now, and never have been, any grounds whatsoever for the appointment of such conservator, nor for the seizure of the assets of said association.

"This Answer and Demand for Hearing is made without prejudice to the rights of said association and all its members, officers, directors, or other interested parties to assert the invalidity of said purported seizure of possession of the premises, assets, securities, etc., of said association and/or to assert the invalidity of the said purported appointment of the said A. V. Ammann as conservator of said association.

"Address for the service of said Notice of said hearing and for the service of any and all other matters in connection with said Long Beach Federal Savings

and Loan Association is hereby designated as follows:

"Long Beach Federal Savings and Loan Association,

c/o its President, T. A. Gregory, 350 E. Fourth Street, Long Beach, California.

"In Witness Whereof, the Long Beach Federal Savings and Loan Association, a corporation, has caused this Answer and Demand for Hearing to be signed by its President and its Secretary-Treasurer this 30th day of May, 1946.

"Long Beach Federal Savings and Loan Association

"By /s/ T. A. Gregory,
"President.

"By /s/ J. E. Gregory,
"Secretary-Treasurer."

and enjoined "until further order of this Court" and this restraint covered the holding, or attempt to hold, "any hearing or hearings pursuant to Order No. 5309 of the Federal Home Loan Bank Administration * * * without first obtaining the further written order of this Court." (That the record may be clear on this matter we note at this point that this restraint was continued after the rule later announced and emphasized in Fahey v. Mallonee, supra.)

In short, this holding of the lower court rested upon the assumption that in its then posture, the entire controversy could, by option of this group of litigants, be forced into the court for de novo determination regardless of fundamental tenets of primary jurisdiction, exhaustion of administrative remedies and the orderly procedures derived therefrom.

The argument against requiring a *prior resort* to the administrative process in the initiatory stage of this litigation was squarely before the Supreme Court nearly a year later in Fahey v. Mallonee, supra, where the Court considered and refused to agree that charges of bias, prejudice and malice of Administration were sufficient to justify judicial interference with or restraint of resort to the process of administrative review.[7]

Because it was later held by the lower court that *if* Mallonee and Association amended their original pleadings to charge Administration with "fraud" when it named Ammann as Conservator of Association, such an amendment to the pleadings would

7. In its comment on this phase of the case the Supreme Court said, 332 U.S. at page 256, 67 S.Ct. at page 1557, 91 L.Ed. 2030: "Objection is made to the administrative hearing upon the ground that it is before the same authority which has preferred the charges and that it cannot be expected, therefore, to be fair and impartial and that the Act does not provide for judicial review of the Board's determination on the hearing." The Court answers this objection by the comment that "We cannot agree that courts should assume in advance that an administrative hearing may not be fairly conducted."

In Isbrandtsen-Moller Co. v. United States, 300 U.S. 139, 145, 57 S.Ct. 407, 410, 81 L.Ed. 562, the Court said that if an administrative order "is justified by a lawful purpose, it is not rendered illegal by some other motive in the mind of the officer issuing it". And the Supreme Court pointed out in Chicago & S. Air Lines v. Waterman S. S. Corp., 333 U.S. 103, 112, 113, 68 S.Ct. 431, 437, 92 L.Ed. 568, that "administrative orders are not reviewable unless and until they impose an obligation, deny a right, or fix some legal relationship *as a consummation of the* administrative process." And cf. R. F. C. v. Lightsey, 4 Cir., 185 F.2d 167; Myers v. Bethlehem Corp., 303 U.S. 41, 48, 49, 51, 58 S.Ct. 459, 82 L.Ed. 638; Gregoire v. Biddle, 2 Cir., 177 F.2d 579. As to the contention that the mere holding of an administrative hearing would result in irreparable damage to Association, see Myers v. Bethlehem Corp., supra, 303 U. S. at pages 50, 51, 58 S.Ct. 459, 82 L.Ed.

638. And the bearing of "motive" in issuing an order within the authority of a public officer is discussed in Spalding v. Vilas, 161 U.S. 483, 498, 499, 16 S.Ct. 631, 40 L.Ed. 780.

An example of the extent to which the law throws a mantle of protection over a public institution in the performance of duties within the scope of its authority is seen in Adams v. Home Owners Loan Corp., 8 Cir., 107 F.2d 139.

The presumption of regularity supports the official acts of public officials, and in the absence of clear evidence to the contrary, the courts presume that they have properly discharged their official duties—the validity of the reasons stated in the orders or the basis of fact on which they rest, will not be reviewed by the courts, United States v. Chemical Foundation, 272 U.S. 1, 14, 15, 47 S.Ct. 1, 71 L.Ed. 131; Cf. United States v. Rock-Royal Co-op, 307 U.S. 533, 559, 560, 59 S.Ct. 993, 83 L.Ed. 1446; Cf. Morgan v. United States, 304 U.S. 1, 15, 18, 19, 58 S.Ct. 773, 82 L.Ed. 1129. In this (Morgan) case the statute required a hearing and the holding is that a fair and open hearing is essential to the legal validity of the administrative regulations and to the maintenance of public confidence of this process. It is an "inexorable safeguard."

In the case of Association, Section 206.2 of the Regulations provides that the Administration *shall* issue and serve a notice of hearing upon the institution, etc. and conduct a hearing *if* Association makes a request for such hearing within 14 days after the appointment of a conservator.

sustain the original collateral attack on the Ammann appointment, we here point out that this charge of *fraud* was not added to the original pleadings of Mallonee and Association until the court authorized such an amendment on November 10, 1947. We discuss this phase of the case at greater length, infra.

The above noted assumptions of the Mallonee-Association group must be appraised by the rule announced in June, 1947 in Fahey v. Mallonee, supra. In that case the Supreme Court considered and rejected the Mallonee contentions that the above noted injunctive remedy was properly employed and we think that its decision also makes plain that the lower court erred when it entertained the suits of these parties prior to a resort to an available and tendered administrative remedy. The significant conclusions reached by the Supreme Court in that case highlight the most vital aspects of the problem facing the lower court in the initiatory stage of the litigation and furnish us with a standard applicable to the early rulings of the lower court which we are here considering. Before calling attention to some of these conclusions it is well to understand just how the lower court regarded the holding in that case and its view as to the issues decided is indicated by pertinent statements.

On November 11, 1949, it stated that "it seemed to me in reading Jackson's opinion *that the only thing he decided* was that you were estopped from asserting the unconstitutionality of the statute." Further: "But while he dissolved the [three-judge court] order restraining the administrative hearing, he did not say that you are estopped from asserting the legality of the regulations."

And at another point on the same day the court expressed the view that "the only thing the Supreme Court did * * * was to hold that the plaintiffs [Mallonee] were estopped from challenging the constitutionality of that section *and nothing else.*"

Association reaches a different conclusion. In its brief on this appeal Association states: "In reversing this judgment, the United States Supreme Court approved either or both administrative hearings or court proceedings, to inquire into the merits of the claims of mismanagement made by appellants as grounds for the seizure and the charges made by appellees Shareholders Protective Committee, et al., that *fraud* and malice were the causes of the unjustified seizures." We find it impossible to reconcile the conclusion of Association that the Supreme Court approved *both* the administrative hearings and the lower court proceedings outlined in this Part of our opinion. It is obvious that if the Supreme Court approved the administrative hearing it could not have approved a proceeding in the lower court which completely nullified administrative procedures at the outset of this case. And the charge of fraud or a fraudulent conspiracy of Administration officials was not before the Supreme Court in the then pleadings of Mallonee.

The length of the Fahey-Mallonee decision forbids setting out the full text but its importance justifies a summary of the decision. The Supreme Court said: (1) Section 5(d) of the Home Owners' Loan Act of 1933, as amended, was constitutional, (2) that the removal of the Conservator of Association by the three-judge court, supra, was improper and that its drastic decree could stand only if 5(d) was unconstitutional, (3) that institutions like Association are created, insured and aided by the federal government, (4) that the provisions of the statute under attack were regulatory, (5) that the Board adopted rules and regulations governing appointment of conservators and they provide grounds upon which a conservator may be named, these being the usual and conventional grounds found in most state and federal banking statutes, and these rules and regulations are sufficiently explicit to be adequate for proper administration and for judicial review if there should be proper occasion for it, (6) that the regulations provide for a hearing *after* the Conservator takes possession and while this is a drastic procedure it is an almost invariable custom to exercise supervision in this summary manner, and it is not unconstitutional, (7) that in this case an administrative hearing was demanded by and accorded to Association, and a

specification of charges against its management was requested and furnished by the Board, (8) that the causes for the appointment of a conservator set forth by the Board were (the Court enumerates the serious charges laid against the management of Association, 332 U.S. at page 254, 67 S.Ct. 1556, 91 L.Ed. 2030), (9) that plaintiffs nevertheless demanded and obtained an injunction to prevent the administrative hearing and they have therefore cut off the making of a record as to whether these charges are well founded. Nor did the trial court take evidence on the subject, (10) that the Court must assume that the supervising authorities would be able to sustain the statements of fact and justify the conclusions in their charges against the management of Association for the purpose of determining the case without trial, (11) that the Court was unable to agree that the management of Association was free to go on undisciplined and unchecked regardless of the charges of the Board, (12) that Association was organized under Section 5 of the Home Owners Loan Act of 1933, which it now seeks to have declared unconstitutional, (13) that the present management of Association obtained a charter which provided that it "shall at all times be subject to the Home Owners' Loan Act of 1933 * *· * and to any valid rules and regulations made thereunder as the same may be amended from time to time * * * and * * * liquidated, merged, consolidated, or reorganized, as provided in the rules and regulations for Federal savings and loan associations", (14) that plaintiffs (Mallonee) sue only in the right of the Association and (as related to the rights of the parties) one may not "retain the benefits of the Act while attacking the constitutionality of one of its most [here Section 5(d)] important conditions," the Act in this case being the one under which Association has its existence, (15) that plaintiffs (Mallonee) attack the validity of the only provision of the law under which proceedings may be taken (by the Board) to liquidate or conserve Association for the protection of its members and the public, (16) that if it can hold the charter that it obtained under the Act and strike down the provisions for terminating its powers or conserving its assets, it may perpetually go on, notwithstanding any abuses which its management may perpetrate, (17) that it would be intolerable that Congress should endow an Association with the right to conduct a public banking business on certain limitations and that the Court, at the behest of those who took advantage from the privilege should remove the limitations intended for public protection.

The Supreme Court further considered the matter of the administrative hearing called by Administration and the charge by Mallonee that it would rob Association of its rights because the hearing would be before the same authority which had preferred the charges—also charges that *the Act* itself does not provide for a judicial review of the Board's determination on the hearing. The Court refused to agree with Mallonee that courts should assume in advance that an administrative hearing may not be fairly conducted, and withheld any opinion as to whether the final determination of the Board was subject to any manner of judicial review. In some general observation the Court stated that absence from the statute of a provision for court review has sometimes been held not to foreclose review and that if supervising authorities wantonly and maliciously destroy the credit of an institution there are not remedies.

The Court carefully refrained from passing upon or deciding Mallonee charges that ill will and malice actuated the supervising authorities and upon charges of the supervising authorities (Board) that Association had been mismanaged and its management was unfit, and it made no determination or intimation concerning the merits of these issues or as to other remedies or relief. The final decision of the Court was that it was error in the three-judge court below to hold Section 5(d) of the Home Owners' Loan Act of 1933, as amended, unconstitutional, to oust the Conservator or to enjoin any of his proceedings, or to enjoin the administrative hearing and this without prejudice to any other administrative or judicial proceedings which may be warranted by law. In sum, the decision in

Fahey v. Mallonee upholds the constitutionality of the law, and the validity of the rules and regulations under which a Conservator for Association had been appointed. It likewise put the stamp of approval on the administrative hearing which had been ordered, and settled the status of appellant Ammann as Conservator.

To the foregoing views of the Supreme Court must be added a reference to the fact that prior to the filing of any of the actions in this litigation and approximately one month prior to the issuance of the injunction of July 1, 1946, Administration had furnished to Association a document demanded by Association which detailed with great particularity serious charges of misconduct against the management of Association in its handling of the affairs of that institution. Numerous offenses against sound business practices were specified, and if true, these charges would seem to justify corrective measures at the hands of Administration. It was this set of charges (referred to by the Supreme Court) upon which Administration had based the appointment of a conservator. This array of charges clearly stated the reasons upon which the appointment was based, and with respect to the matter of timing of the hearing and the preservation of procedural due process, this specification of charges fully advised Association of the precise nature of the charges it would have to meet when these charges were formally considered in the administrative hearing granted at the request of Association.

The Fahey-Mallonee decision makes abundantly plain that the Supreme Court regarded the original charges laid against Administration in the pleadings of Mallonee and Association as utterly failing to provide any sort of legal justification for the lower court to entertain the plenary suits of these parties and upon their demand restrain all attempts to require resort to the process of administrative review prior to court action. In short, this decision simply means that the lower court committed reversible error when, on July 1, 1946, and over the protest of the administrative officials here involved, it entertained the suits of the Mallonee-Association group thereby asserting a primary jurisdiction clearly without foundation or justification in law.

■ Long ago the Supreme Court announced the principle that "Courts will not issue injunctions against administrative officers on the mere apprehension that they will not do their duty or will not follow the law." Waite v. Macy, 246 U.S. 606, 609, 38 S.Ct. 395, 396, 62 L.Ed. 892. Cf. Lehmann v. State Board, etc., 263 U.S. 394, 397, 44 S.Ct. 128, 68 L.Ed. 354. See also cases cited in Footnote 7 herein and the illuminating discussion on the question of exhaustion of administrative remedies as a prerequisite to suit, in Aircraft & Diesel Equipment Corp. v. Hirsch, 331 U.S. 752, 67 S.Ct. 1493, 91 L.Ed. 1796.

The Injunction and Its Consequences

Because of the duration and character of this litigation and the vast number of litigants and issues finally involved, it has seemed desirable to here outline in considerable detail the proceedings leading up to the issuance of this injunction and the various steps associated with and following the injunction order.

The early course pursued by the court at the insistence of the Mallonee-Association group was promptly challenged by Administration (through Ammann), the first Ammann challenge being directed at the assumed right of the court to entertain the Mallonee suit, this by a motion to dismiss filed on June 14, 1946. This motion asserted that the court was without jurisdiction over the person of Fahey, an indispensable party to this action, and that the plaintiffs failed to state a claim upon which relief could be granted.

Subsequently, and by a formal answer to the Mallonee suit (filed on October 21, 1946) Ammann set up certain defenses including that of failure of Association to exhaust available administrative remedies provided by Rules and Regulations of the Federal Home Loan Bank Administration after Association had demanded and had been accorded such an administrative hearing; also that Association and Mallonee,

358

over the protest of Ammann, had secured an injunction order restraining the holding of the administrative hearing which had been set by Administration. The prayer was for dismissal of the Mallonee action. We refer to this pleading, infra. And see our comments, infra, re the Administrative Procedure Act, Title 5, § 1001 et seq., which became effective on September 11, 1946.

As noted above the Mallonee suit was filed on May 27, 1946 and the Association answer and cross-claim (in the Mallonee suit) was filed on July 1, 1946. Upon the filing of the Mallonee suit the lower court issued a "Temporary Restraining Order" which restrained interference by Administration in the affairs of Association. No reference was made in this order to an administrative hearing since that was not ordered until June 5, 1946 (by Administration Order 5309).

Prior to the last mentioned date and on May 24, 1946, Association filed with Administration a formal written "Demand for a More Definite Statement of Cause for the Appointment of Conservator" for Association[8] whereupon Administration (under date of May 29, 1946) did provide and serve

8. The *demand* of Association for a more definite statement of cause for the appointment of a Conservator reads as follows:

"Demand for More Definite Statement of Cause for Appointment of Conservator of Long Beach Federal Savings and Loan Association.

"Whereas, the undersigned, Long Beach Federal Savings and Loan Association of Long Beach, California, has not, by its Board of Directors, or otherwise, consented to or requested the appointment of either a conservator or receiver, nor either of them, nor any similar action, and

"Whereas, one A. V. Ammann did, on the 20th day of May, 1946, physically seize and wrest possession of the said association, premises, assets, securities, bank accounts and books from the officers, directors, and members of said association, claiming to be empowered and authorized to do so by an Order purportedly made by the Federal Home Loan Bank Administration as Order No. 5254, purportedly dated May 20, 1946, and purportedly signed by Ray V. Dougherty, assistant secretary, and

"Whereas, the making of this Demand has been duly authorized and directed by a Resolution of the Board of Directors of said Long Beach Federal Savings and Loan Association at a meeting duly held for said purpose, and

"Whereas, said Long Beach Federal Savings and Loan Association, its officers, directors and members, are unable to ascertain or determine from the said purported order, from the said A. V. Ammann, or from any other source whatsoever, the grounds, reasons, or basis for which, or upon which, its said premises, assets, securities and books have been thus seized and wrested from its possession and control,

"Now Therefore, pursuant to Section 206.2 of the Rules and Regulations of the Federal Savings and Loan System heretofore adopted by the Federal Home Loan Bank Administration and by other governmental authorities, and also as a general demand independent of and in no way connected with said regulations or any of the same, demand is hereby made upon the Federal Home Loan Bank Administration, and upon the Honorable J. Francis Moore, Secretary thereof, and upon John H. Fahey, upon A. V. Ammann, upon Ray V. Dougherty, both *individually* and in *whatever official* capacities they, or any of them, may occupy, for a definite statement, and itemization of the grounds, causes and purposes of the said seizure of possession and control of the premises, properties, assets and securities of said corporation and of the purported appointment of a conservator therefor.

"This Demand is made without prejudice to the rights of said association and all its members, officers, directors, or other interested parties to assert the invalidity of said purported seizure of possession of the premises, assets, securities, etc., of said association and/or to assert the invalidity of the said purported appointment of the said A. V. Ammann as conservator of said association.

"Address for the service of said statement and for the service of any and all other matters in connection with said Long Beach Federal Savings and Loan Association is hereby designated as follows:

"Long Beach Federal Savings and Loan Association, c/o Its President, T. A. Gregory, 350 E. Fourth Street, Long Beach 2, California.

"In Witness Whereof, the Long Beach Federal Savings and Loan Association,

upon Association such a "More Definite Statement." [9]

a corporation, has caused this Demand to be signed by its President and its Secretary-Treasurer this 24th day of May, 1946.

"Long Beach Federal Savings and Loan Association

"By /s/ T. A. Gregory,
"President.

"By /s/ J. E. Gregory,
"Secretary-Treasurer."

9. The more definite statement of the causes for the appointment on May 20, 1946 of Conservator for Association reads as follows:

"More Definite Statement of the Causes for the Appointment on May 20, 1946, of the Conservator for Long Beach Federal Savings and Loan Association, Long Beach, California.

"T. A. Gregory
"350 East Fourth Street
"Long Beach 2, California

"The following is a more definite statement of the causes for the appointment on May 20, 1946, of a Conservator of the Long Beach Federal Savings and Loan Association:

"1. Said Association, in the opinion of the Federal Home Loan Bank Administration, was conducting its business in an unlawful, unauthorized, and unsafe manner, and was pursuing a course that was jeopardizing and injurious to the interests of its members, creditors, and the public in that:

"(a) During the period from September 11, 1945, to March 7, 1946, disbursements of funds of said Association totaling $14,500 were made to its President, T. A. Gregory, without proper voucher therefor, or explanation thereof in the records of the Association, itemized as follows:

| | |
|---|---:|
| 9/11/45—T. A. Gregory | $ 1000.00 |
| 10/22/45—Wired to T. A. Gregory, Washington, D. C. | 1000.00 |
| 11/ 5/45—Wired to T. A. Gregory, Washington, D. C. | 1000.00 |
| 11/24/45—T. A. Gregory | 1000.00 |
| 12/ 1/45—Wired to T. A. Gregory, Washington, D. C. | 2000.00 |
| 1/19/46—T. A. Gregory | 2000.00 |
| 1/31/46—Cash (Wired to T. A. Gregory) | 1500.00 |
| 2/20/46—Cash (Wired to T. A. Gregory at Washington, D. C.) | 2000.00 |
| 2/28/46—Cash (Wired to T. A. Gregory at Washington, D. C.) | 2000.00 |
| 3/ 7/46—Cash (Wired to T. A. Gregory at Washington, D. C.) | 1000.00 |
| Total | $14,500.00 |

After these formalities had been observed Administration issued its said Order

"(b) Disbursements totaling $14,500, itemized under (a), were used for purposes beyond the scope of the Association's business.

"(c) Funds of the said Association totaling $2455.60 were disbursed to Howard S. Leroy, an attorney at law at Washington, District of Columbia, on or about January 30, 1946, January 31, 1946 and March 6, 1946, although said attorney had not been retained by the said Association, nor were such funds paid to said attorney for the handling of any business of the said Association, or otherwise for the benefit of said Association.

"(d) The Board of Directors of said Association attempted in the following manner to relieve T. A. Gregory from accountability to the said Association for its funds used by him for purposes beyond the scope of the said Association's business:

"(1) The said Board of Directors, according to the minutes of a special meeting, dated January 16, 1946, voted to compensate T. A. Gregory retroactively in the sum of $11,750 for services rendered by him in 1945, for which the said T. A. Gregory had already been paid in accordance with the terms of his employment.

"(2) The said Board of Directors, according to the minutes of the special meeting, dated January 16, 1946, voted to increase T. A. Gregory's salary from $8250 to $20,000 per year.

"(3) On April 6, 1946, reimbursement of said Association's funds paid to T. A. Gregory and used by him for purposes beyond the scope of the Association's business, was recorded on the books of said Association by means of an offset against the purported liability of the Association to T. A. Gregory for the said sum of $11,750 and for the voted increase for the first three months of 1946.

"(e) The Association, by vote of its Board of Directors, purportedly on January 16, 1946, undertook to compensate T. A. Gregory retroactively in the sum of $11,750 for services rendered by him in 1945, for which the said T. A. Gregory had already been paid in accordance with the terms of his employment, said purported retroactive salary increase being unlawful and unauthorized.

"(f) The Association paid salaries and fees which were excessive and not commensurate with the services rendered.

"(g) The Board of Directors of said Association on May 8, 1946, appropriated the sum of $100,000 of the funds of said Association for the purpose of restraining the proper use of safeguards and controls provided by the Congress of the United States with respect to Federal Savings and Loan Associations, and threatened the removal of said sum from the proper control of said Association.

"(h) During the course of a regular examination commencing on May 18, 1946, by Examiners of the Federal Home Loan Bank Administration, a director and officer of the said Association unlawfully and improperly removed a cashier's check in the amount of $50,000, payable to the said Association and representing funds belonging to it, without accounting therefor.

"(i) On or about May 8, 1946, the said Association, through its officers, executed a purported lease on a hotel property located at 332 American Avenue, Long Beach, California, owned by it to one George Turner for a 20-year period on terms which, in effect, would give to the said Turner the use of said property without adequate consideration therefor to the said Association.

"(j) Said Association was being used for the personal gain of one or more officers and directors thereof, to the detriment of its members and creditors.

"(k) Said Association, through its officers, engaged in activities which were inimical to the interests of veterans of the Armed Forces, including veterans of the Armed Forces who were members of the said Association.

"(l) Certain directors of said Association, namely: T. A. Gregory, J. E. Gregory, M. T. Killingsworth and S. I. Bacon, on or about May 18, 1946, undertook to convert, or attempted to convert, their shareholdings and other funds totaling approximately $21,000 into approximately 21,000 separate purported share accounts of $1.00 each, in violation of the rights of over 16,000 share account holders of said Association, and in violation, or attempted violation of their duties as directors.

"(m) Said Association failed to file copies of audit of said Association made by F. W. Lafrentz & Co., Certified Public Accountants, Los Angeles, California, as of the close of business May 19, 1945, or thereabouts, as required by Section 203.2 of the Rules and Regulations for the Federal Savings and Loan System.

"(n) The said Association failed to maintain its books of accounts and records correctly.

"(o) The records or statements of the Association were falsified in that either

"(1) The minutes of the Board of Directors' meeting of January 16, 1946, were falsified by the entry therein of actions by said Board purporting to have been taken increasing T. A. Gregory's salary from $8250 to $20,000 per year, and purporting to authorize the payment of $11,750 to T. A. Gregory as extra compensation for the year 1945.
or

"(2) The said Association's liabilities were misrepresented by the Board of Directors to the Federal Home Loan Bank Administration in monthly reports for the months ending January 31, 1946, February 28, 1946, and March 30, 1946.

"2. Said Association, in the opinion of the Federal Home Loan Bank Administration, had a management which was unfit and unsafe to manage a Federal Savings and Loan Association in that, among other things,

"(a) The matters set forth in subitems (a), (b), (c), (d), (e), (f), (g), (h), (i), (j), (k), (l), m), (n) and (o) of Item 1, above are herein incorporated by reference.

"(b) T. A. Gregory in 1934 (but only recently known to the Federal Home Loan Bank Administration) acquired control of the Reliable Building-Loan Association, Long Beach, California, and so manipulated its affairs that he was enabled to acquire, through the medium of Somerset Finance Co., a substantial number of certificates of the Reliable Building-Loan Association at a small fraction of their true value, and subsequently redeemed said certificates at the Reliable Building-Loan Association at their true value, while like treatment was denied to others, all to the detriment of the members of the said Reliable Building-Loan Association, and to his own personal gain.

"(c) The officers of said Association failed to keep or cause to be kept the books of account and records of the Association correctly.

"Dated: May 29, 1946.
"/s/ J. Aldrich Hall,
"Attorney for Federal Home Loan Bank Administration."

No. 5309 [10] which directed a "hearing officer" to conduct a field hearing at Los Angeles, California on July 3, 1946, at which hearing he was to take testimony in accordance with and pursuant to the terms of the said order. The purpose of this order is clear. It set a preliminary field hearing at which complainants could present each and all of their objections to the appointment of a Conservator for Association and challenge the validity of the Ammann appointment. All of this is made plain by an inspection of the order.

The transactions above referred to all indicate that the *legality* of the appointment of a Conservator was a subject of

10. The text of Order 5309 setting administrative hearing issued on June 5, 1946, reads as follows:

"Federal Home Loan Bank Administration

"Order No. 5309

"Date June 5, 1946

"Whereas, a conservator has been appointed for the Long Beach Federal Savings and Loan Association, Long Beach, California; and

"Whereas, an answer has been filed and written demand made for a hearing, pursuant to Section 206.2 of the Rules and Regulations for the Federal Savings and Loan System:

"It Is Hereby Ordered, that a hearing shall be held at Room 510 Chester Williams Building, 215 West Fifth Street, Los Angeles, California, on Wednesday, the third day of July, 1946, at 10:00 o'clock in the forenoon, before a Hearing Officer, at which hearing the Long Beach Federal Savings and Loan Association, Long Beach, California, may appear and show cause why the conservator should not have been appointed and why an order should be entered by the Federal Home Loan Bank Administration discharging the conservator.

"And It Is Further Ordered, that any person, partnership, association, or corporation claiming to have an interest in the subject matter involved may, at any time before the closing of the hearing, file a petition for leave to intervene at said hearing;

"And It Is Further Ordered, that the said Long Beach Federal Savings and Loan Association, any member or creditor thereof, the Federal Home Loan Bank Administration, and any party whose petition for intervention has been allowed, shall have the right, by counsel or otherwise, to appear and be heard at the hearing, to produce, examine, or cross-examine witnesses, to introduce documentary or other evidence, and to file briefs and reply briefs;

"And It Is Further Ordered, that the said Hearing Officer shall have complete charge of said hearing; may receive, admit, allow, exclude and deny petitions and evidence, including the hearing of testimony according to the rules of evidence governing civil proceedings in matters not involving trial by jury in the courts of the United States, provided, however, that such rules may be relaxed by the said Hearing Officer in order to promote the just determination of the ultimate issue; may limit the time within which briefs and reply briefs may be filed and may require the furnishing of copies thereof to other parties; shall order the preparation of a record, including a transcript of the testimony and evidence presented; may make rulings and note exceptions, but shall not have power to decide any motion to dismiss the proceedings or other motion that involves final determination of the ultimate issue; may hear arguments, may adjourn the said hearing from time to time, if, in his judgment, it is desirable to the orderly conduct of the said hearing or to promote the just determination of the ultimate issue; and may do all such things and have all such powers as are necessary or proper to the orderly conduct of said hearing or to promote the just determination of the ultimate issue, but shall not have power to finally determine the ultimate issue;

"And It Is Further Ordered, that after the close of the hearing the said Hearing Officer shall transmit as promptly as possible to the Secretary to the Federal Home Loan Bank Administration the complete transcript of testimony taken, together with any exhibits, briefs, or other material incorporated in the record of said hearing;

"And It Is Further Ordered, that the Secretary or an Assistant Secretary shall advise all parties appearing at said hearing in person or by attorney, by registered mail, return receipt requested, promptly upon receipt of said transcript, of the filing thereof, and shall make such transcript available for inspection by any such party and supply a copy thereof, upon request, to any such party at a price which will cover the reasonable cost of its preparation, as determined by the Secretary;

"And It Is Further Ordered, that notice of the hearing herein provided for

196 F.2d—23½

bitter controversy prior to the filing of any of the pleadings of the Mallonee-Association group of litigants and thus became the basic and decisive issue presented in their pleadings and motions for an injunction.

On June 20, 1946, Mallonee moved for a "Preliminary Injunction" to restrain the holding of the administrative field hearing set for July 3, 1946. The Mallonee motion is lengthy but it averred generally that such a hearing at Los Angeles would irreparably injure the Mallonee group and other shareholders in Association. In part it asserts:

"That the holding of said purported administrative hearing, the constitutionality of which is placed in question by this pending action, would constitute a multiplicity of actions, be an encroachment and infringement upon the jurisdiction and authority of this Honorable Court to hear and determine the questions, including constitutional questions raised by this pending action and would cause immediate and irreparable damage and injury to these plaintiffs and to the interest of the other approximately 16,000 shareholder members in the said Long Beach Federal Savings and Loan Association and would injure and damage the good-will and going concern value of said Association and its shareholder members, and the result of publicity might restart a 'run' of withdrawals from said Association, which might even exceed the 'run' or withdrawals caused by the seizure of said Association by said defendant, A. V. Ammann, as purported Conservator, which said 'run,' within a comparative short time, caused withdrawals in excess of $6,000,000.00."

This Mallonee motion also asserted that the proposed administrative hearing would be a travesty upon justice for the reason that it would not be conducted in a fair and impartial forum; that Fahey would not be fair and impartial in passing on his own acts; that Administration would not only be influenced by bias and prejudice but had already decided and determined the issue of the validity of the Ammann appointment; that the Mallonee group (Association shareholders) was not a party to the administrative hearing nor were the (then) interpleading parties, yet *their* "rights" (all local property rights) would be seriously affected by the decision or determination made by Fahey or Administration. (Here they are obviously referring to the "final determination" of Administration reached after and as a result of the showing made by all parties at the preliminary hearing before the field hearing officer in the Los Angeles hearing.)

In a long argument filed with the aforesaid motion Mallonee states that practically all of the (Association) assets seized by Administration belonged to California residents; that the administration officials have previously and on March 29, 1946, seized the assets of the Federal Home Loan Bank of Los Angeles by reason of which seizure the administration officials had come into possession of Association assets held by that bank amounting to $400,000; that the seizure of Association was an act done to prevent the officers of Association from bringing appropriate litigation against Fahey, Ammann and others for the return of Association assets held by the said Bank; that the seizure of Association was an act of reprisal and retaliation against officers of Association for their resistance to the usurpation by Fahey of the management, control and direction of the said Bank and the Federal Home Loan Bank of Portland, and the refusal of Association officers to permit Fahey to control elections of the President of the Los Angeles Bank. Other charges were made including that of malice

shall be served by the Secretary to the Federal Home Loan Bank Administration by mailing a copy of this order by registered mail to Long Beach Federal Savings and Loan Association, c/o its President, T. A. Gregory, 350 E. Fourth Street, Long Beach 2, California.
 * * * * * *

"I hereby certify that the above is an order issued by the Federal Home Loan Bank Administration on June 5, 1946.
"By /s/ J. Francis Moore,
"Secretary.
"Copy received.
"[Endorsed]: Filed June 14, 1946."

and animosity of Administration officials against Association and its officers.

To the foregoing "objections" Mallonee added a demand for a three-judge court to pass upon its claim of unconstitutionality of Section 5(d) of the Home Owners' Loan Act of 1933, as amended. (The lower court later convened such a three-judge district court to consider this issue and it held the section unconstitutional. Its decision was reversed in Fahey v. Mallonee, supra.)

On July 1, 1946 Mallonee filed another motion for a "Temporary Restraining Order" to enjoin the holding of an administrative hearing, urging that this order remain in effect until its motion for a "Temporary Injunction" could be heard. Upon the filing of this motion the lower court issued a "Temporary Restraining Order" (the injunction referred to supra) which enjoined the holding of such a hearing "without first obtaining the further written order of this court." This restraining order remained in effect for a long time— in fact it was not vacated until sixteen months later (November 10, 1947) on motion of appellants. Thus the restraint on an administrative hearing was not vacated until more than four months after the Supreme Court announced its decision in Fahey v. Mallonee, supra.

Ammann filed timely objections to the issuance of this restraining order. In his objections he relied on the Rules and Regulations of the Home Loan Bank Administration relating to and authorizing administrative hearings.[11] (In our previous summary of the holding of the Supreme Court we noted its reference to the legal sufficiency of the rules and regulations of Administration.) The objection of Ammann was maintained after the order of restraint was issued on July 1, 1946. And in passing we express the view that Orders 5254 and 5309 were preliminary and procedural in character and, as indicated in

Order 5309, lacked the aspect of a final determination of Administration on the validity of the appointment of a Conservator.

The early objection of Ammann (on June 14, 1946) to the right of the lower court to entertain the Mallonee suit and the later objection to the restraint against the holding of an administrative hearing must be considered in light of the fact that on May 30, 1946 Association had demanded and had been accorded such an administrative hearing on the Ammann appointment.

In its first responsive pleading in the Mallonee suit (July 1, 1946) Association (also) assails the proposal for the noted administrative hearing despite the fact that it had previously demanded and had been granted such a hearing.

In a memorandum argument filed on July 5, 1946 by the United States District Attorney at Los Angeles in opposition to the previous issuance of the above noted "Temporary Restraining Order" which was then blocking the holding of the administrative hearing on the charges against Association, this Government counsel representing Ammann commented on the legal effect of continuing with the administrative hearing. Since these comments have a significant and pertinent bearing on the problem of an administrative hearing then the dominant issue in the Mallonee-Association suits and motions, we set out his brief argument at this point. He said:

"Let us consider what the effect might be of continuing with the administrative hearing.

"(1) The appointment of a Conservator will either be set aside or in the alternative justified.

"(2) The completion of the administrative hearing will remove the objection heretofore urged, that the ad-

11. The applicable regulations of the Home Loan Bank Administration effective in 1946 provided for an administrative hearing on the appointment of a Conservator, at the request of an association, at which the association "may appear and show cause why the Conservator (or receiver) should not have been appointed and why an order should be entered by the Federal Home Loan Bank Administration discharging the Conservator (or receiver)." Reg. Sec. 206.2.

ministrative remedy has not been exhausted.

"The present action is, of course, premature until the exhaustion of such administrative remedy has been effected."

We think that the foregoing contentions of the United States Attorney not only succinctly stated the basic issue then confronting the court and the parties, but were clearly in harmony with the later expressed conclusions of the Supreme Court in Fahey v. Mallonee, supra.

Typical of the position of the administrative authorities in this early stage of the Mallonee-Association litigation is an answer of Ammann (containing certain reservations therein about the Fahey-Mallonee litigation then pending in the Supreme Court). In this answer to the Mallonee complaint (filed October 21, 1946, as above noted) Ammann averred generally that the complaint failed to state a claim on which relief could be granted; denied an unlawful seizure of Association; asserted that title to its (all local) property still remains in Association; asserted that Association was organized and incorporated under and by virtue of rules and regulations adopted by the Home Loan Bank Board pursuant to Section 5 of the Home Owners' Loan Act of 1933, as amended, 12 U.S.C.A. Sec. 1464. (See footnote 11)

In this Ammann answer it was further alleged that in 1934 the Board received an application to organize a federal association which petition was signed by Gregory (President of Association at the time of this litigation) and others; that this petition shows the full consent of the petitioners to be bound by the law and rules and regulations made thereunder; that a *charter* was accepted by Association and it would not have been issued if such statements had not been made and relied upon; that among the provisions contained in the *charter* were the following (3 provisions are noted); that a binding regulation was in force at the time of the acceptance of the charter; that Association commenced operations under said *charter*

shortly after it was issued and remained thereunder until April 13, 1937 when it petitioned for an amendment of the charter and was granted a new charter (charter K); that Association has continued to operate under this (later) charter K; that when it accepted the amended charter K a regulation of the Board was in effect which permitted appointment of a conservator if it appeared to the Board that the interests of the creditors or members were being jeopardized; that since the organization and incorporation of Association it has continued to submit requests to proper officials that they subscribe for shares in said Association and the Treasury and the Home Owners Loan Corporation did subscribe and purchase shares of Association and thereby provided additional capital; that said requests and such subscriptions for purchases were made pursuant to the provisions of Section 5 of the Home Owners' Loan Act of 1933 and the purchases were made pursuant to the rules and regulations of the Board and Administration; that Association is now estopped to deny the validity of such law or rules and regulations; that Association accepted this *charter* under the rules and regulations and is thereby estopped; that the rules and regulations of Administration provide for the appointment of a conservator and that upon his appointment such Association may demand a more definite statement of the ground, and may demand and upon such demand, *shall* receive an administrative hearing at which such Association *or any interested person* may show cause why such conservator should not have been appointed *and why he should be removed*. (See reference to the matter of the charter of Association in Fahey v. Mallonee, supra, 332 U.S. at p. 255, 67 S.Ct. 1552, 91 L.Ed. 2030).

The answer of Ammann to the Mallonee complaint also averred generally that Association demanded such a definite statement and received it, and demanded an administrative hearing on June 5th and it was granted under Order 5309 which set Los Angeles as the place for holding the hearing; that the holding of such an administrative hearing was restrained by an injunction secured by Mallonee and As-

sociation; that Administration has at all times been ready and willing to hold such a hearing and to give Association and Mallonee an opportunity to show cause why the Conservator should not have been appointed *and why he should be removed.*

At the time of the filing of the Ammann answer just above referred to, Fahey filed a motion challenging the jurisdiction of the court over the subject matter of the Mallonee-Association actions and over Fahey. The motion also set forth that Fahey was an indispensable party over whom the court lacked jurisdiction and that the complaints of these parties fail to state a claim entitling them to relief.

Other motions by Fahey sought dismissal of the actions of other interveners then in the Mallonee-Association litigation. The basis of the motions is that the pleadings of these interveners and interpleaders do not state a claim against Fahey and that the appointment of Ammann was lawful. Fahey also challenged the jurisdiction of the court.

On June 28, 1946, Title Service Company (previously a party in the Mallonee suit by an answer therein filed on June 4, 1946) filed a motion in the Mallonee suit in which it likewise sought a "Preliminary Injunction" to restrain the holding of the above noted administrative hearing set for July 3, 1946. This motion is too long to set out in extenso. We summarize it because it is typical of the contentions then presented to the court as a reason for restraining the holding of such an administrative hearing. It notes the purpose of Administration to hold an administrative hearing under Order No. 5309; asserts that Fahey will determine by himself whether he acted properly and within his authority and jurisdiction in appointing Ammann as Conservator of Association; that by the Ammann appointment Association was seized without prior notice and/or hearing; that the provisions of the Federal Acts under which Administration was acting and the rules and regulations purportedly made and adopted pursuant to and under these Acts are unconstitutional as an attempt to delegate legislative and judicial authority to Administration

and Fahey and as such are ineffectual (this was a charge considered by the Supreme Court in Fahey v. Mallonee, supra); that the proposed administrative hearing would not be conducted in a fair and impartial forum because Fahey would there be determining the propriety and validity of his own act and the acts of his subordinates in Administration; that the administrative hearing would not be a fair and impartial adjudicator because these administrative officials will be influenced in such adjudication by *bias and prejudice and have already decided and determined the issues* upon which they proposed to hold the said administrative hearing; that the questions proposed to be heard and determined by Administration at the hearing, to wit, why the Conservator should not have been appointed and why he should be discharged, are questions involving the constitutionality of the rules and regulations and Acts under which the Conservator was appointed and which questions are now pending before a three-judge court (decision of three-judge court later reversed in Fahey v. Mallonee, supra).

Title Service Company also stated as another ground for its motion for an injunction that it and another interpleader are not parties to this administrative hearing yet their (local) rights and interests might be seriously affected by any decision or determination which might be made by Administration and its officials; that the holding of the said hearing would *constitute a multiplicity of actions,* and be a distinct encroachment and infringement of the jurisdiction and authority of the lower court to hear and determine all questions raised by this pending (Mallonee) action and would cause immediate irreparable damage and injury to movent this because Administration would determine the validity of its own acts in appointing Ammann.

The foregoing contentions of the Mallonee-Association group as to the futility and "illegality" of the administrative hearing ordered on the Ammann appointment, present in clear outline the real basis for the action of the lower court in promptly

convening a three-judge court to pass upon the issues which were then before the lower court, including the propriety of the lower court's order of July 1, 1946, forbidding the holding of a field hearing pursuant to what we regard as a purely preliminary procedural order of the administrative agency.

After the lower court entered its restraining order of July 1, 1946, all proceedings in the lower court appear to have ground to a full halt until the three-judge district court summoned by the lower court had been convened and its decision duly entered.

As we have indicated above, the final decision of this three-judge district court was considered and reversed by the Supreme Court but despite the fact that the Supreme Court decision laid at rest any doubts concerning the propriety and legality of the previous restraining order entered by the lower court and the error in entertaining the actions of the Mallonee-Association group prior to a resort to and an exhaustion of the then tendered and available administrative remedies, the lower court continued to entertain these actions, with results we later note.

The Fahey-Mallonee decision robbed of all merit the contention that prior resort to an administrative hearing and exhaustion of the administrative remedies then available would have been a futile gesture because of the claimed bias, malice and prejudice of Administration. See comments in Footnote 7. We think that the decision of the Supreme Court indicated that the ultimate "determination" of Administration would have appraised and decided these very claims and this decision would have later faced the scrutiny of a reviewing court. Efforts of counsel could not have obscured the basis and legal nature of the claims of the parties then objecting to the Conservatorship when the matter was later before a reviewing court for final decision.

It is not contended on this appeal that had the available and tendered administrative remedies been exhausted at that time, the final order or determination of Administration on the validity of the Ammann appointment would not have been subject to a prompt judicial review at the request of Association and the interested parties who might have "intervened" in the field hearing. It is apparent that the tense emotional attitudes then dictating the course pursued by the complaining parties caused them to reject this idea in toto. They regarded the appointment of a Conservator as an illegal invasion which deprived them of "property rights" in Association and that this procedure was of itself sufficient to foreclose debate on the wisdom or necessity of pursuing so-called "administrative remedies" through to an ultimate determination by the administrative agency.

But measured against this view is the fact that the litigation was then in a preliminary stage which antedated the incredible involvements which came at a later period, all of which could and would have been eliminated by the simple expedient of promptly resolving doubts at this early stage concerning the validity of the conservatorship. The way was wide open to such an accomplishment by an immediate resort to the administrative process and judicial review of the ultimate order made by Administration on that issue. The simple fact is that the course pursued in the court below led to the necessity for the later interpleading of various litigants and the many interventions shown in the long record. All of these complications arose out of growing uncertainties as to the exact legal status of local property rights caused by the continued existence of the conservatorship.

An interesting sidelight on the question of judicial review of a final determination of an administrative authority appears at p. 2917 of the transcript in an argument of Mallonee filed on December 4, 1947, in which it sets forth that "the determination, if any, by such a proposed administrative tribunal would be reviewable in the federal courts by trial de novo and hence the partial trying of a limited part of the total litigation would be an idle act and unnecessary." It is here referring to an administrative hearing reset for a later date under Order 5309. Since the argument speaks for itself little comment is necessary concerning its implications. Obviously the "determina-

tion" it refers to is a *final* determination of an agency, and it is clear that in this litigation *that character* of "determination" was never reached on the order appointing Ammann.

Furthermore, it would be mere juggling of words void of meaning to use such an argument (employed in opposing a later administrative hearing called in 1947) to characterize the posture of the litigation on July 1, 1946. Passing on the validity of the Ammann appointment at that time would not have been the "partial trying of a limited part of the total litigation * * * [and] an idle act and unnecessary." The validity of the Ammann appointment was then the heart and soul of the litigation and was not a "limited part." A final judicial decision by a reviewing court which disposed of the ultimate determination of Administration on the validity of the Ammann appointment, would have promptly ended the entire controversy which inspired the suits of the Mallonee-Association group.

It is implied in all of the arguments of the appellees who resisted the administrative hearing of July 3, 1946 that the status of the parties might have been changed to the disadvantage of these appellees during the time involved in the hearing procedures and their consummation in the final order of the court reviewing the final determination of Administration. This view of the problem overlooks the fact that the reviewing court would have ample authority to preserve the status of all parties in a manner which would fully avoid such a suggested hazard. See discussion in Scripps-Howard Radio, Inc. v. Federal Communications Commission, 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229.

It is not strange that another administrative hearing ordered to be held in December of 1947 posed some awkward problems. The early procedures we have described, and the amendments to the pleadings of Mallonee and Association (discussed infra) which were authorized by the court on November 10, 1947, were inspiring a flood of new claims of the numerous interpleaders and interveners these being injected into the controversy because such a course was regarded by these parties as absolutely

necessary to protect property rights thought to be jeopardized or adversely affected by the continuing conservatorship. This fact alone is convincing evidence that the validity of the conservatorship should have been speedily and conclusively decided at the very outset of this prolonged litigation by a prompt resort to and exhaustion of the administrative remedies, followed by a judicial review of the final determination of the administrative agency. The least that can be said of this procedure is that it would have ended doubts then plaguing all parties, thereby allaying growing fears and uncertainties as to the status of business relationships with Association all of which later caused this litigation to "snowball" into the mountainous proportions revealed by the record on this appeal.

We cannot escape the conviction that the lower court and the parties complaining of the Ammann appointment must have realized on July 1, 1946 that menacing complications would inevitably ensue if the *validity* of the Ammann appointment was not *soon determined* by a final judicial authority. His then control over the affairs of Association was not only giving concern to the large group of shareholders of Association but was beginning to raise important questions concerning relationships of Association with other financial institutions. It is certain that the Conservatorship was vitally affecting relations between Los Angeles and Association, a situation which added to the increasing unrest of all parties. Every aspect of the controversy called for prompt action to dissipate uncertainties concerning the legal status of the Conservatorship.

The outstanding fact about this litigation is that outlawing the administrative process did not eliminate any of these impending difficulties. The truth is revealed in the record—the restraining order merely insured "a multiplicity of actions." Despite the order the Conservatorship remained in effect for about 20 months and during this period the doubts and fears multiplied all of which served to expand the orbit of the litigation.

A revealing and significant colloquy between court and counsel took place on

March 8th of 1948 during arguments on certain motions of Mallonee and Association concerning the then operations and the status of the Conservator. The question raised was whether Ammann was (still) possessed of power to act in that capacity *after* the Supreme Court had announced its decision in Fahey v. Mallonee, supra. The question debated was whether this decision made Ammann a de facto or a de jure conservator. Counsel for Mallonee and Association both stated to the lower court that in their view *the legal status of Ammann was still in this case as an undecided issue.* All counsel present seemed to agree that this was the case. The court then announced that it had previously decided that the section of the Act, Section 5(d) (considered in Fahey v. Mallonee, supra) was unconstitutional *but did not decide any of the other things concerning the legality or illegality of the Ammann appointment.* The court added the significant and enlightening observation that (as to the legality or illegality of the Ammann appointment) Mallonee and Association "have *since* amended their pleadings to make assertions of illegality." (This exchange of views took place some four months after the court had authorized an amendment of the Mallonee-Association complaints to charge the administrative authorities with acting fraudulently in appointing Ammann as Conservator. See later comment on this amendment.)

This March, 1948 colloquy occurred *twenty months* after the court had enjoined the administrative hearing specifically called to provide an administrative review and final judicially reviewable determination of the validity of the Conservatorship. Four and one-half years later the litigation confronts us on appeal from a preliminary injunction against another and later administrative hearing set for a date in December, 1949, and in its findings and conclusions of law entered in connection with this later injunction, the court formally states that *it still faces* the judicial task of passing on and deciding the *validity* of the original appointment of Ammann as Conservator under Order No. 5254 which was issued on May 20, 1946. The persistence of that issue is one of the remarkable aspects of this litigation. Setting up a road block which denied access to the process of administrative review and a later judicial review of a final administrative determination which would promptly have laid at rest all question about the legality of the Ammann appointment, bore strange fruit as a reference to a few of the ensuing complications will clearly indicate.

We continue to emphasize that the injunction of July 1, 1946 wholly failed to eliminate the prophesied evils of delay, confusion and a "multiplicity of actions," a fact made all too evident by even a casual inspection of the record, the lengthy briefs of the parties and the Findings of Fact which accompany the order of injunction now on appeal. The very fact of the existence of the conservatorship for twenty months after the injunction order was an inspiration for more and more litigation by additional "fringe" parties who felt obliged to intervene. Association has stressed in its briefs the fact that these interveners and interpleaded parties found this sort of course absolutely necessary in order to protect their interests.

The long record is a vivid portrayal of the melange of issues and parties finally and inevitably drawn within the expanding boundaries of the controversy as a result of failure to lay at rest in the very beginning the matter of the validity of the Ammann appointment. The vast array of parties and issues we here note came into this litigation after, and we think as a result of, the amendments to the pleadings of Mallonee and Association which were authorized by the lower court on November 10, 1947. We refer to these amendments at a later point in this part of our opinion. This tremendous expansion of the litigation deserves more than a passing glance for it makes apparent the fact that the new flood of litigants arising out of this expansion of the area of controversy, injected into the litigation a host of serious and highly complicated problems of law and fact for the consideration of and adjudication by the lower court —in fact, the parties accent the

very difficult task the court faced by reason of this fact. It finally appointed a Master to handle some of the multifarious problems besetting the court and a controversy over liability for the Master's fees is now on appeal in this court.

To add to the complications, it appears from the brief of Association that ten associations (not parties to this appeal) brought suit in the United States District Court for the Northern District of California, to enjoin and prevent a "settlement" of the litigation. These associations (referred to as the "Northern Ten") are similar in character to appellee Association and are located in the San Francisco Bay area. Prosecution of this action was halted by a preliminary injunction issued by the lower court on the ground that all of the issues raised by the action were already pending in the lower court since all parties in the northern action were already parties in the instant consolidated actions. The position and the contentions of these litigants are not pertinent on this appeal.

Facts revealed in the record and in comments in the briefs present a bewildering picture and one that adds prophetic emphasis to the June, 1947 comment of the Supreme Court in Fahey v. Mallonee, supra [332 U.S. 245, 67 S.Ct. 1558], that "there is more to this litigation than meets the eye on the pleadings." The briefs indicate that the litigation finally brought within its orbit fifteen proceedings in state and federal trial and appellate courts and two Congressional investigations. The printed part of the record in the instant appeal contains approximately 11,500 pages necessitating a separate index of 129 pages. The full record on this appeal contains nearly 20,000 pages (in addition to 5,000 pages of reporters' transcripts) and is a narrative of proceedings in which there were more than fifty interpleaders and more than 100 hearings which are asserted to have resulted in ten final judgments. Thousands of parties were named defendants, including 8,000 "John Doe Borrowers" from Association; 100 "Intermeddling Does"; 100

"John Doe Receivers"; 100 "John Does" named as trustees under deeds of trust; hundreds of "John Does" and "Jane Does," "Roe and Doe" co-partnerships; "Black and Co." corporations, 1 to 100 inclusive, and "Red Associations." The amounts of the individual interpleaders have varied from as high as $6,300,-000 in one proceeding, to clear the titles to approximately 4,000 homes of 8,000 local borrowers. These individual home owners became involved in their efforts to clear the tangled titles to their individual homes and in this effort causing various amounts to be deposited into court as the balance due on home loans. Numerous other parties were specifically named as parties defendant including past and present officers and directors of the Federal Home Loan Bank of San Francisco; The Federal Savings and Loan Insurance Corporation; 10 Savings and Loan Associations located in Northern California; the 80 officers and directors of said associations; Land Title Insurance Co., a corporation which allegedly undertook to insure titles of borrowers during the period of the Conservatorship.

The lower court also pointed out in the findings accompanying the injunction order now on appeal that 400 parties have appeared or defaulted in the proceedings constituting the several actions in that court and that there were 50 separate and different intervention actions; that in the early days of the Conservatorship there was filed with the recorder of Los Angeles County, California, a notice of Lis Pendens (in the Mallonee action) which notice designated therein several thousand parcels of real estate located in that county upon which Association had made loans. The court finds that the legal force and effect of said Lis Pendens is an issue of law yet to be determined when this case is finally tried on its merits.

The fact is that the innumerable transactions in the years of the litigation along with the motions, pleadings, memorandum, arguments and interim orders make it utterly impossible to provide a satisfactory

analysis of the lengthy and involved record before us.[12]

By reason of the duties thrust upon it the lower court was finally forced to supervise a great many of the details of a modern banking business and thereby face all of the vexations that accompany such an unusual task.

■ After their first and above noted objection to the sufficiency of the original pleadings in the Mallonee-Association group actions had been overruled, appellants continued to maintain their objection that these pleadings failed to state a claim upon which relief could be granted. The persistence of this objection obviously created grave doubts in the mind of the court for in the early part of November, 1947 it again considered the objection and thereafter and on November 10, 1947 (sixteen months after it had issued the restraining order based on the original pleadings of the Mallonee-Association group of litigants, and four and one-half months after the decision in the Fahey v. Mallonee case, supra) it concluded and held that the original Mallonee-Association complaints failed to state a claim upon which relief could lawfully be granted to these plaintiffs (see comments in Footnote 13) and that these original complaints would have to be dismissed.

In light of the decision in Fahey v. Mallonee, supra, (announced June 23, 1947) touching the administrative hearing issue, this holding of the lower court was clearly correct, and it erred when it *then* failed to promptly dismiss these actions. In following the procedures noted below the court further erred for in so doing it compounded its original error of entertaining the actions of the Mallonee-Association group of litigants prior to the exhaustion of the administrative process.

■ After thus concluding and holding that the original Mallonee-Association pleadings failed to state a claim the court advised Mallonee and Association that *if* their original complaints were *then* amended by adding thereto the further charge

that the administrative officials had acted *fraudulently* in appointing a Conservator for Association in May, 1946, and in attempting to hold an administrative hearing on this appointment, the original complaints, *as · thus amended,* would state a claim entitling these litigants to the relief they had sought in their original pleadings which relief the court had granted on these original pleadings. The Mallonee and Association complaints were thereafter amended in conformance with this ruling. (As amended, they were of such extreme length as to defy attempts to properly summarize them within reasonable limits.)

The short of it is that the court must have concluded that the administrative remedy need not be invoked provided the original pleadings were amended to allege "fraud" because this sort of a later amendment would somehow, and under some undisclosed theory of law, operate retroactively to cause the original Mallonee and Association complaints to state a claim for relief which justified the action of the court in restraining (on July 1, 1946) the then attempt of Administration to require resort to and exhaustion of the tendered and available administrative remedies.

We cannot agree that such amendments operated in this retroactive manner and thus provided a sound legal basis for further entertaining these actions. The procedure adopted by the court was an attempt to validate and breathe the breath of life into a previous judicial act which granted relief that could only have been justified in law if based on allegations in the original complaints which entitled the pleaders to the relief then demanded in their pleadings.

So here we have a situation where confessedly the court had not only entertained the original injunction actions of Mallonee, Association and Title Service Co. but for sixteen months thereafter had continued to pass upon and adjudicate issues based upon their purported claims for relief which claims had no existence or substance in law because they failed to present

12. The instant appeal is only one of several now pending and growing out of this litigation.

a justiciable controversy. On the court's own ruling of November 10, 1947 (see Footnote 13) these original complaints had no standing in the court on July 1, 1946 and should have been dismissed on Ammann's first motion. Mallonee adds to the significance of this unusual situation by its frank contention that the complaints of Mallonee and Association, *as amended,* (under authority of the order of November 10, 1947) *stated "causes of action."* And it further enlightens us by urging that the *only* material issues are (1) whether the court below had jurisdiction over the non-resident defendants, for any purpose, and (2) whether *any* of the pleadings state a claim for relief within the jurisdiction of the court below. The second point thus urged is designed to embrace the amended pleadings above referred to.

There is clear indication that the lower court, and Mallonee and Association, are here relying upon the theory that *after* the original complaints of Mallonee and Association were *amended,* under authority of the order of November 10, 1947, the pleadings, as so amended, did state a cause of action, that is to say, a claim upon which relief could then be granted. This is shown by the fact that in its findings of fact entered on December 1, 1949 the lower court states that "the plaintiffs [Mallonee] and * * * Association, *by their amended and supplemental complaint and amended and supplemental cross-claim,* have challenged and put in issue, the validity of some of the rules and regulations purportedly adopted by the defendant * * Board." The court then states that this challenge is not only directed at the validity of the orders affecting Los Angeles but also the validity of Order No. 5254 appointing a Conservator for Association and the Order calling an administrative hearing on the appointment of Ammann. (In this ruling of November 10, 1947, the court did not suggest that it had continued to entertain the suits after July 1, 1946 because of its original view that the orders were *final orders* of the administrative agency.)

Despite the above noted holding of November 10, 1947 that the original complaints of Mallonee and Association had failed to state facts upon which relief could be granted, the lower court made a Conclusion of Law on December 1, 1949 "that upon the filing of plaintiff's [Mallonee] complaint, original jurisdiction vested in this court, by virtue of the presentation of many federal questions arising under the Constitution and laws of the United States, among which are:

"(a) Constitutionality and construction of the following Acts of Congress:

"Home Owners' Loan Act;

"Federal Home Loan Bank Act;

"First and Second War Powers Act, and related acts and amendments to one or more of said acts.

"(b) Constitutionality construction and validity of regulations and amendments and repeals of regulations by defendants Home Loan Bank Board and their predecessors, and by other governing authorities of the United States.

"(c) Constitutionality construction and validity of orders adopted by, pursuant to, or under, one or more, of the foregoing, enumerated in (a) and (b) above.

"(d) Determination of rights and claims arising under, and created by, one or more, of said Acts of Congress, regulations, repeals, and amendments thereof and orders, rescissions, amendments or modifications thereof, enumerated in (a), (b), and (c) above.

"That such Federal questions were amplified and enlarged by filings by various of the parties, including amended and supplemental pleadings subsequent to the mandate of the U. S. Supreme Court pursuant to its opinion in Fahey v. Mallonee, 332 U.S. 258, 67 S. Ct. 1552, 91 L.Ed. 2030."

From the foregoing it is clear that the lower court was convinced that the decision in Fahey v. Mallonee, supra, along with the above noted *amendments* to the pleadings of Mallonee and Association, cleared away any doubt of the propriety and legality of continuing to entertain the actions of these parties.

In our view the conclusion of the lower court runs counter to the holding in Fahey v. Mallonee, supra, and was without support in the law as pronounced by the Supreme Court. Furthermore, the language of the lower court carries the broadest intimation that these issues were raised largely if not almost entirely in *the amended pleadings* of the appellees filed six months or more after the decision in Fahey v. Mallonee, supra, but it is also clear that despite its ruling of November 10, 1947, the court, on December 1, 1949, was not entertaining any doubt as to the legality of its entire course from and after the inception of the Mallonee-Association litigation.

Possibly some observations of the Supreme Court in Fahey v. Mallonee, supra, may have convinced the lower court that adding a charge of "fraud" to the original Mallonee and Association pleadings justified its procedural course [13] from the beginning of the litigation. If this was the view of the lower court, we cannot agree with it. In any event, it apparently assumed that these pleadings, as amended, did provide such justification, a

13. On November 10, 1947 the trial judge made some very significant comments in an oral opinion delivered from the bench when he was considering the still pending formal motions of Ammann (in which he had moved to dismiss the Mallonee action for failure to state a claim) and also the proposed amendments to the original Mallonee and Association complaints. Because the comments shed much light on most important aspects of the Mallonee case, we indicate the substance of certain of his remarks as follows:

That he thought he was required by the Fahey decision to pass upon the aforesaid motions to dismiss; that these motions *were not decided* by the Supreme Court; that appellants had filed a motion to vacate the first injunction decree because plaintiffs had refused to exhaust an administrative remedy provided and tendered to them under the Rules and Regulations of Administration; that all of the said motions were also based upon the alleged failure of the complaints of Mallonee and Association "to state a claim"; that while Ammann's status as a Conservator had been established by the Fahey-Mallonee decision it did not say or hold that Ammann's status was immune from attack (prior to a resort to the process of administrative review) *on the ground of fraud and malice,* nor did it say or hold that ultimate judgment would favor the legality of his appointment *after an administrative hearing and court review;* that Association has argued primarily that the statute under which Administration purported to act was unconstitutional and the Regulations thereunder are illegal because *they are contrary to the charter of Association;* that defendants had urged that the *holding of an administrative hearing is a preliminary jurisdictional prerequisite* and that he was inclined to agree with that view were it not for the allegations in the cross-complaint of Association *which counsel for Association contends* are in effect *a cause of action for fraud';* that a charge of *fraud* in the pleadings *might* be considered a possible basis for attack by Mallonee and Association upon the act of Administration in appointing Ammann; that so far as concerns a charge of fraud as a reason for sustaining the complaints of Mallonee and Association against a motion to dismiss, reference is made to the Midstate case, Midstate Amusement Corp. v. Rivers, D.C., reported at 54 F.Supp. 728 which deals with a charge of fraud; that the doctrine of cases holding that a court of equity, once having taken jurisdiction of a matter, retains jurisdiction of the *entire matter* so that *all claims* can be decided, is here applicable with reference to both the Association matter and the Mallonee claim; that the court has power to *order* that the Mallonee and Association complaints be amended, this because he had considerable doubt in his mind as to whether or not the pleadings in these cases state a cause of action *for fraud; that he did not think that Mallonee and Association had stated a claim for relief on the ground of fraud* (in their then pleadings in which the gravamen of the charge was bias, malice and prejudices of the administrative authorities); that for this reason the motions to dismiss these complaints should be granted *on the ground* that they had failed to state a claim for illegality of the Regulations *and* conduct and fraudulent activity of Administration. (By "conduct" we assume that the judge was referring to acts of administrative officials which Mallonee and Association claim revealed an attitude of bias and malice.)

By way of conclusion the Judge further stated: "Each, the original plaintiffs [Mallonee] and the Association, will be given an opportunity to amend. After they amend, the question may again be

fact evidenced by the findings and conclusions which accompany the injunction order now on appeal.

At this point in our opinion it is well to note one of the major consequences of these amendments by a reference to the demands voiced in these amended pleadings. As amended, the Mallonee complaint and the cross-claim of Association prayed for a judgment and decree that all obligations incurred by Association during the Conservatorship, particularly the loan from the San Francisco Bank, and all transfers of the Association's property in pledge or otherwise during the said period, were null and void, and directing that all such property in the possession or control of appellants herein be returned to Association, or that, if such property could not be so returned, Association be awarded money damages against the appellants personally served within the local district in the amount of the highest value from the time the property was allegedly converted to the date of the trial.

A later supplemental cross-claim of Association, filed on May 27, 1948, prayed for such damages without limitation to the property which could not be so returned or to the defendants thus served.

Conformably with these allegations and demands which were thus voiced in the above noted amended pleadings of these appellees, thousands of parties were named defendants, these additional parties being those above referred to in this part of our opinion. Their presence in the litigation is conclusive proof that failure promptly to settle the legal status of the Conservatorship at the very outset of the litigation caused it to assume the astounding proportions we have noted. Had a judicial decree following exhaustion of administrative remedies declared the Ammann appointment to be invalid, that deci-

sion would have ended a controversy that has engaged the courts for years.

We note at this point that on December 1, 1949, the court entered a significant Conclusion of Law (in support of the injunction order now on appeal) in which it set forth that *as a matter of law* the lower court "*had and still has,* jurisdiction under the Administrative Procedure Act, and has jurisdiction *for determination of the issues * * * to be presented concerning the following * * *.*" Whether in this Conclusion the court is implying that it had jurisdiction under the Administrative Procedure Act from and after the effective date of that Act, is not clear. In any event, the court designates five orders, among them Order 5254 which appointed Ammann as Conservator of Association. We refer to this Conclusion of Law because it raises a question as to the applicability of the Administrative Procedure Act to "pending suits" (a contention advanced by some appellees).

A finding made at the same time sets forth that the court must still "review" the (original) five orders and "that the review of each and all of said orders involves many questions of law which include *the legality of said orders at the time of the making thereof.*" We fully agree with the lower court that on July 1, 1946 the *legality* of the Ammann appointment was the dominating issue. That issue was still *undecided* by the court when it issued its injunction order of December 1, 1949— the order before us on this appeal.

The fact that *all* of the property in question was locally situated and locally owned caused Mallonee and Association to later urge that an administrative hearing ordered to be held in the month of December, 1949 in Washington, D. C. was a great injustice. The court agreed

---

raised by the defendants as to whether or not the pleadings are duplicitous . * * * As I read the decision of the Supreme Court, and as I read the other decisions relating to administrative hearings and relief concerning similar matters, if the *facts* exist a complaint can be stated on the ground of *fraud.* * * * the plaintiffs [Mallonee] and the Association are

entitled to opportunity to amend. * * * As I have heretofore indicated, I think that the filing of the [Fahey-Mallonee] mandate vacated the [injunctive] decree [of July 1, 1946]." (Emphasis supplied.)

At this point the court vacated the original injunction of July, 1946, which enjoined the administrative hearing first called at the request of Association.

that requiring the parties to attend this hearing would necessitate the transfer of vast quantities of records and documents to that place and thereby put an impossible burden on appellees. The same general argument was also presented by Mallonee in December of 1947. We accept these arguments (advanced against later administrative hearings ordered) because they are void of merit when measured against the fact that on July 1, 1946 one simple and controlling issue of law was present—the legality of the Ammann appointment. To secure an authoritative decision on that issue was to wipe out the cause of the litigation at a time when adjustments could have been made without undue disruption of business relationships. It was not necessary to produce a mass of business records to meet the issue of the validity of the Ammann appointment had that issue been squarely faced in 1946 in an administrative hearing, and such a contention was not made. Nor is it made on this appeal.

To shed further light on the case we note the dates when final pleadings of the appellants brought the various cases to issue in the lower court. Pursuant to a court order of June 6, 1948, the answers of appellants to all pleadings were filed on July 30, 1948. These answers alleged, inter alia, that the lower court lacked jurisdiction both over the persons of the non-resident defendants, and of the subject matter of the actions, and that none of the complaints or cross-claims stated a claim for which relief could be granted.

The same defense had been promptly made on the institution of the litigation. Motions to dismiss by the Home Loan Bank Board, its members and Fahey, Ammann, and the Federal Home Loan Bank of San Francisco, and the other defendants, filed on September 13, 1948, were finally overruled on October 17, 1949. The Federal Savings and Loan Insurance Corporation, served as a non-resident defendant on September 20, 1948, filed a motion to dismiss on November 22, 1948 which was overruled on October 17, 1949 and filed an answer to all current pleadings on July 18 and August 7, 1949.

Because it seemed necessary to a clear understanding of basic issues at the outset of this litigation we have burdened this opinion by a somewhat detailed description of the Mallonee-Association-Title Service Co. phase of the case, and have endeavored to indicate the results of the procedure adopted by the court in the initiatory stage of the litigation. Our purpose in so doing is to make clear the reason for our ultimate holding on this appeal.

A few other matters deserve a brief comment.

Comments of Association and Mallonee advanced in December of 1947 shed much light on their views concerning the administrative process. The contentions of Mallonee as to the matter of intervention in the hearing set for July 3, 1946 is illuminating in light of the express provisions in Order No. 5309 relative to the intervention of interested parties.[14]

14. The record provides many interesting and illuminating sidelights on the administrative procedure issue.

In a request for a postponement of an administrative hearing before the Federal Home Loan Bank Board which had been set for a day in December, 1947, Association on December 4, 1947 tendered certain arguments which we now repeat. Among other matters it is said: "As a direct and proximate result and cause of the said false, fraudulent, malicious and unwarranted appointment of said A. V. Ammann, as Conservator * * * the titles to the homes of the 8,000 borrowers from * * * Association have become hopelessly entangled,

enmeshed, clouded and impaired and said home owners, even upon payment in full of the amount borrowed from * * * Association are unable to obtain a clear or marketable title; and said borrowers have been compelled to, and have, intervened in said court proceeding.

"Said administrative hearing would be unable to determine all of said issues and in fact could determine but a tiny fraction of the issues which have arisen *since* the year and a half which has elapsed since the date of the said Long Beach seizure and the twenty months that has elapsed since the date of the said Los Angeles seizure." In this request Association urges that the hearing

Because it is contended on this appeal that the order appointing Ammann was, in itself, a *final order* immediately subject to judicial review by the lower court we call attention to the fact that a provision of Order 5309 expressly deprived the "hearing officer" of all power *to finally determine the ultimate issue,* or to decide any motion to dismiss the proceedings or other motion that involves *final determination.* The simplicity of these directives leaves nothing for "interpretation" on the issue of "finality"—they are too plain for dispute. There can be no doubt that the clear and "ultimate issue" thus deliberately posed was (as Association has indicated) the *validity* of the appointment of a Conservator for Association on the charges made against its officials. Obviously the issue of validity was to be put to a test in the later and formal hearing before Administration at which time the final determination then pronounced by Administration as its ultimate action on that issue would represent the consummation of the administrative process. For reasons we indicate, there can be no doubt that such a final administrative determination would have been subject to a judicial review at the behest of Association. And see our comment in Footnote 15, infra.

On July 1, 1946, Mallonee urged that the question "as to why" the Conservator should not have been appointed and *why* Administration should discharge him, "are questions involving the constitutionality of the rules, regulations and acts or part thereof, under which said Conservator was

be postponed and that the Board call such a hearing *only if* such. Federal court proceedings after final adjudication prove unable to completely decide, determine and remedy the complex situations only partly above outlined.

On December 4, 1947 Mallonee filed a protest against an administrative hearing referred to in the above noted Association request. In this protest Mallonee sets forth that "the determination, if any, by such a proposed administrative tribunal would be reviewable in the federal courts * * * and hence the partial trying of a limited part of the total litigation by an administrative tribunal would be an idle act and unnecessary." Also "the holding of the proposed inadequate and expensive administrative hearing is unnecessary, as the United States Federal Courts have already taken jurisdiction and denied the motions of the defendants Ammann and Fahey for dismissals of the various interpleaders, cross-actions, interventions and third party complaint, and thereby have already taken complete jurisdiction of all of the issues and of all of the parties and of all of the property, and can and will of necessity have to make a complete determination of all the matters involved in one trial at a minimum of expense to these Shareholder Members."

In this document Mallonee refers to interested parties who might have sought to intervene in an administrative hearing. It points out that the administrative tribunal could have no authority to *force* any person, corporation, organization or association to become a party to said hearing and would have jurisdiction *only*

over such parties as might voluntarily appear and submit to the jurisdiction of such administrative tribunal; that Mallonee cannot and does not voluntarily submit to the jurisdiction of a so-called administrative tribunal.

The Mallonee protest contains a very illuminating and highly significant comment on the Ammann appointment. It states: "An administrative hearing held by * * * Administration under the provisions of Section 206.2 of the Regulations of the Federal Home Loan Bank System could not adjudicate or determine any of the rights of any of the parties hereto, *save and except only why* said A. V. Ammann should not have been appointed as the conservator for * * * Association, and *why* he should now be discharged as such conservator, which *adjudication* would be subject to review in the Federal Courts of the United States, and the holding [in December of 1947] of such administrative hearing would further subject the shareholders of * * * Association to additional and vexatious litigation and further expense and could only result in further delay and irreparable damage to all of the parties to such Federal Court litigation."

While this 1947 comment dealt with an administrative hearing set for December of that year it points up with clarity the simple nature of the issue confronting the court on July 1, 1946 when it made impossible an administrative hearing which would have determined at that time *why* Ammann should *not* have been appointed, and *why* he should. be discharged as Conservator.

allegedly appointed and which *same questions* are here raised in this litigation now pending before this Honorable Court and should be heard by a Court composed of Three Judges * * *." The Supreme Court answered this particular contention in the Fahey case, supra, and it requires no further comment.

Mallonee also asserts the right to prosecute its original suit because the shareholders were not afforded a "right to any administrative hearings or procedure and none was given them." This argument must be weighed against its argument referred to in Footnote 14. The shareholders (Mallonee) made no demand to be designated as parties to the administrative hearing on July 3, 1946, but in any event we think this omission, and failure to name them as parties in the text of the order, is without legal significance. The specific terms of the order setting the field hearing in Los Angeles on July 1, 1946, constituted an open invitation to "any person * * * claiming to have an interest in the subject matter involved * * * to file a petition for leave to intervene." Certainly the shareholders of Association would be regarded by Administration as persons claiming to have an interest in the matter of the Ammann appointment and nothing appears in the record which indicates that they would have been denied the right to intervene in the field hearing of July 3, 1946.

We agree with appellants that it is "novel doctrine" that an administrative remedy may be ignored because formally extended to the corporation but not in terms to many thousands of corporate shareholders. (See Mallonee argument in Footnote 14.) In a true sense Association was the alter ego of its shareholders; it voiced their most basic contentions with great vigor because its stake in the controversy impelled it to demand the very relief they were seeking. Moreover, it fully demonstrated its ability to forcibly and clearly present to the court every facet of every conceivable argument against requiring a prior resort to the administrative process to test the validity of the Ammann appointment. As a matter of fact its arguments on this point duplicate those of Mallonee in all essential particulars.

Appellees assert that the administrative hearing tendered by Order 5309 (See Footnote 10) would have been futile because the Board officers had already stated that under no circumstances would they ever return the business of Association to its founding officers and directors. Contentions of this nature were rejected by the Supreme Court in Fahey v. Mallonee, supra.

Some arguments of Association on this appeal indicate that it has not been an easy task to justify by-passing of the administrative process in the beginning of the litigation. Despite the text of Order No. 5309, Association here asserts that this order merely *purported* to provide an administrative hearing for Association where the appointment and removal of Ammann could be "considered." In our view this argument is void of merit.

Association further argues on this appeal that

"Exhaustion of administrative remedies is a doctrine which, like most other general rules, is subject to exceptions. It does not require that review of erroneous administrative procedure *be postponed* until review is impossible or fruitless. The party reviewing the administrative procedure alleged to be unlawful, malicious, arbitrary or capricious, is not required to suffer complete destruction of his business and final confiscation of his property before seeking such review.

"If * * * Association were compelled to undergo another period of several years of tangled titles for its borrowers * * * withdrawals * * * attorneys' fees, and * * * another conservatorship * * * judicial review would very probably come too late to prevent the complete destruction of the Association."

and

"Whatever may have been the original status in 1946 of the judicial proceeding being reviewed in this appeal from a preliminary injunction [issued

December 1, 1949] this Honorable Court of Appeals should review the situation as it exists at the time of consideration of the appeal, or at the very earliest, at the time of the granting of the preliminary injunction [here] appealed from."

and

"* * * and whatever might have been the status of the earlier administrative hearings for the Association, such hearings were in 1947 abandoned by appellants."

We are unable to find in arguments of this tenor and purport any justification whatever for the judicial procedures adopted in the initiatory stage of the litigation which made resort to and exhaustion of administrative remedies an impossibility, thereby producing the delays and involvements we have described and which have been the subject of much bitter comment. Nor do these arguments explain away the fact that for sixteen months the court confessedly entertained and adjudicated issues tendered in original complaints which wholly failed to state claims upon which any sort of relief could lawfully be granted.

By way of final appraisal we conclude that nothing in this record or the arguments of the parties carries the slightest suggestion that a prompt judicial review of the final determination of Administration made after the field hearing of July 3, 1946 would not have promptly evoked a court decree that speedily ended the conservatorship of Association or declared it to be lawful. So much seems clearly spelled out in Fahey v. Mallonee, supra, and arguments advanced on this appeal fail to convince us to the contrary.

And as to the importance of giving the administrative agency the first opportunity formally to determine the extent of its jurisdiction and to deal in a final way with matters falling within its reach, see comments in Camp v. Herzog, 88 U.S.App.D.C. 373, 190 F.2d 605 and S. S. W., Inc. v. Air Transport Ass'n of America, D.C.Cir., 191 F.2d 658.

The suggestion about "postponement" of review until review is impossible or fruitless falls of its own weight if it was intended to be directed at the hearing set for July 3, 1946. That hearing was not being "delayed"—it was promptly tendered by Administration under its applicable regulations. (See Footnote 11.) Prompt judicial review of the final administrative order or determination would have been obtained had Association not secured an injunction forbidding recourse to the very procedure it had previously invoked. See Fahey v. Mallonee, supra.

The various aspects of the initiatory stage of this litigation in their relation to administrative procedures of a federal agency have been given extensive treatment in this part of the opinion because of their vital importance. Their significance is evidenced by the fact that the Mallonee-Association group of litigants devoted much space in their briefs to a vigorous argument on this early phase of the litigation.

### III

In the preceding parts of this opinion we outlined the original complaints and demands of Mallonee, Association, Title Service Co., Robert H. Wallis and Home Investment Co. and described briefly the complicated pattern of litigation which ultimately resulted from the procedure adopted by the court in the initiatory stage of the Mallonee-Association group bracket of the litigation.

We previously pointed out (Part II) that the lower court was fully advised at the outset that the Mallonee-Association group of litigants were demanding a form of relief which, if granted, would completely outlaw the administrative process. The court was then fully aware that the rules and regulations of Administration were in form applicable to such orders as that appointing Ammann as Conservator; that these rules and regulations, and the statutes authorizing them, were being assailed by Mallonee and Association as unconstitutional; that it was being contended that the statute under which Association existed did not in terms provide for an administrative review of agency orders which fact deprived the purported rules and regulations of vitality.

The lower court adopted the contentions of the Mallonee-Association group and, as we have indicated, the Supreme Court considered them in Fahey v. Mallonee, supra, and rejected them. In this decision (332 U.S. at pp. 250–253, 67 S.Ct. at pages 1554, 1555, 91 L.Ed. 2030) the Court stated that:

"The Board adopted rules and regulations governing appointment of conservators. They provided the grounds upon which a conservator might be named, and they are the usual and conventional grounds found in most state and federal banking statutes. They are sufficiently explicit, against the background of custom, to be adequate for proper administration and for judicial review if there should be a proper occasion for it."

The Court also rejected, 332 U.S. at page 253, 67 S.Ct. at page 1558, 91 L.Ed. 2030, the argument that the regulations were invalid because they provide for an administrative hearing *after* the Conservator takes possession instead of before.

Aside from charges of the same general character as those mentioned above, applicability of the rules and regulations to the challenge of Association is not seriously questioned. In any event the holding of the court in Fahey v. Mallonee swept away the only substantial contentions of the Mallonee-Association group respecting the validity and applicability of the said rules and regulations.

At the conclusion of its decision in Fahey v. Mallonee, the Court summarized its views in the significant statement that it was error for the lower court *to oust the conservator or to enjoin any of his proceedings or to enjoin the administrative hearing* and this without prejudice to any other administrative or judicial proceedings which may be warranted by law. Here we have not only a blunt appraisal and condemnation of the initiatory proceedings in the lower court but also a significant reference to "any other administrative * * * proceedings". The last words of this pronouncement would be void of meaning if we disregard the fact that the court was referring to further *administrative proceedings* which would eventuate in a final

agency determination which decided the validity of both the Ammann appointment *and* the order setting the field hearing on July 3, 1946, this final decision to be promulgated either under the then rules and regulations of Administration *or* possibly (if delay ensued) under provisions of the Administrative Procedure Act which had been approved only a few days prior to the date of this decision. The Supreme Court certainly did not overlook the presence of that legislation or its possible application to this litigation. We refer to the Administrative Procedure Act at a later place.

From all of the foregoing we must hold and do hold that the rules and regulations of Administration were valid and were applicable to the contentions of Association on July 1, 1946. These, together with the orders of Administration were such as to make available to Association *a final review hearing* before Administration in which the *validity* of the order appointing Ammann and the order setting a hearing on this appointment would not only have been open to challenge and direct attack on the same grounds advanced in the lower court as a reason for enjoining the administrative hearing, but would have eventuated in a final judicially reviewable order or "determination" of Administration on this specific issue. We also hold that refusal of Association to avail itself of the administrative remedy tendered in May of 1946 under these rules and regulations, deprived it and/or the members of the Mallonee-Association group of the legal right to demand and receive at the hands of the court the relief sought, including the preliminary injunctive relief by the granting of which the lower court (and also the later called three-judge court in 68 F.Supp. 418, at page 421) struck down the entire process of administrative review.

The conclusions above stated are required by the fact that a lawful basis for the granting of such injunctive relief was wholly absent because the original complaints, cross-claims, motions and other documents of the Mallonee-Association group failed to state a claim upon which *any* relief could be granted by a federal court, a fact frankly

recognized by the lower court on November 10, 1947. We need not labor the point that if these original pleadings did not present a "case" (a justiciable controversy) which brought the pleaders within the judicial power of the United States in a federal court, the court was without jurisdiction. (In this connection it should be noted that injunction is but an accessory to jurisdiction.) We have noted in Part II that Mallonee significantly and candidly argues that the complaints of Mallonee and Association (as amended under the court order of November 10, 1947) "stated causes of action." *The amendments* that are asserted to have finally made the complaints "state a cause of action" were not added to the original complaints until sixteen months *after* the court had wrongfully granted injunctive relief based on these original complaints.

■ And we think it quite clear that the pleadings of the subsidiary and interpleading litigants Wallis and Home Investment Company (to which we refer in Part I of this opinion) failed to tender an issue or issues which presented a claim upon which relief could have been granted by the court —this, if for no other reason than the posture of the claims of the Mallonee-Association group then before the court which revealed unresolved doubts as to the control of Ammann over the property and affairs of Association of which the claims of Wallis and Home Investment are part and parcel. If the relief then demanded from the court by the Mallonee-Association group was improperly and unlawfully granted by the court, it is certain that the ancillary and subsidiary claims of these litigants which arose only out of the claims of Association, were without substance in law. The validity of their claims rested upon the validity of the claims of Association. If the claims of Association were untenable in law, it is obvious that the claims of these litigants could rise no higher than their source. Settlement of the issue as to the validity of the conservatorship and the extent of the Conservator's control of Association's affairs

would have reached every area of the controversy. and resolved the basic issues presented in the contentions of these two parties.

Predicated on the views expressed above we now hold that the court should have dismissed all of these original (five) actions for the reason that they failed to state a claim upon which relief could be granted and for the further reason that Association had failed to exhaust tendered and available administrative remedies under the valid and applicable rules and regulations of Administration above mentioned.

By way of comment which we think is more than justified by the record, we point out that such business records of Association as might have been necessary to a full presentation of Administration charges against the management of Association at the outset of this litigation were located in Los Angeles and readily available for the use of the parties at the preliminary field hearing set for July 3, 1946. Competent counsel could and would have been able to keep the material issues in this inquiry within a comparatively narrow range since the bare legal issue was (as appellees themselves have indicated) the validity of the Ammann appointment. In this sort of legal climate and upon this narrow issue, the making of a satisfactory record for use in the subsequent formal hearing before the administrative body (Administration) and for use in a later judicial review of its final determination, would have presented a very simple problem for the skillful attorneys of Mallonee and Association.[15]

Many cases have been cited to support contentions of the Mallonee-Association group and these contentions call for a brief reference. It is urged that because the administrative remedy is provided in the rules and regulations rather than by specific provision in the statute, the remedy is no remedy at all; that the Conservator was appointed in advance of the hearing set by Administration; that bad motives prompted

15. We express no opinion as to whether the lower court or a federal court in the District of Columbia would have had jurisdiction to review the final order or "determination" of Administration.

the appointment and this made the appointment illegal as a purely arbitrary act.

The decision in Fahey v. Mallonee, supra, which dealt with conditions as they existed at the inception of this litigation, completely rejects these arguments. It made clear that the "determination" on the question whether (in the face of the serious charges against the management of Association, which if true involved violations of fiduciary obligations) there was cause *for appointing or continuing a conservator in office,* was *initially* for administrative decision and not for independent determination of the courts. See also Red River Broadcasting Co. v. F. C. C., 69 App.D.C. 1, 98 F.2d 282, 287; Aircraft & Diesel Corp. v. Hirsch, 331 U.S. 752, 67 S.Ct. 1493, 91 L. Ed. 1796; Far East Conference v. United States of America, 72 S.Ct. 492, Association was presented with a complete list of the charges well in advance of the hearing set to consider them, and given full opportunity to make a record which might have rebutted the charges at this hearing.

As the Supreme Court pointed out, the fact that the Conservator was appointed in advance of the hearing does not excuse failure to exhaust the administrative remedy. See also Yakus v. United States, 321 U.S. 414, 439–441, 64 S.Ct. 660, 88 L.Ed. 834; Lichter v. United States, 334 U.S. 742, 792, 68 S.Ct. 1294, 92 L.Ed. 1694; Utley v. St. Petersburg, 292 U.S. 106, 109, 54 S.Ct. 593, 78 L.Ed. 1155. It will not do to say that the tendered administrative hearing would not have explored every angle and aspect of the appointment. And if the order appointing the Conservator was justified by a *lawful purpose,* it was not rendered *illegal* by some other motive in the mind of the officer issuing it. Isbrandtsen-Moller Co. v. United States, 300 U.S. 139, 145, 57 S.Ct. 407, 81 L.Ed 562, and cases cited therein. And see Cooper v. O'Connor, 71 App.D.C. 6, 107 F.2d 207, 209, certiorari denied 308 U.S. 615, 60 S.Ct. 263, 84 L. Ed. 514, considering acts done by an officer which are in relation to matters committed by law to his control *or* supervision, *or* in connection with the general matters committed by law to his control or supervision.

Cf. Tagg Bros. v. United States, 280 U.S. 420, 444, 445, 50 S.Ct. 220, 74 L.Ed. 524; Spalding v. Vilas, 161 U.S. 483, 499, 16 S. Ct. 631, 40 L.Ed. 780; Gregoire v. Biddle, 2 Cir., 177 F.2d 579, 581; R. F. C. v. Lightsey, 2 Cir., 185 F.2d 167, 170; United States v. Rock Royal Co., 307 U.S. 533, 559, 59 S. Ct. 993, 83 L.Ed. 1446; Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773, 82 L.Ed. 1129.

And where an administration official exercises the jurisdiction conferred upon him, though his errors may be subject to subsequent correction, they may not be enjoined as an arbitrary exercise of his authority—to hold otherwise would render orderly administrative procedure impossible. Adams v. Nagle, 303 U.S. 532, 542, 543, 58 S.Ct. 687, 82 L.Ed. 999. (Personal corruption and breach of trust for personal gain are not charged against Administration officials in the instant case.)

We have previously indicated that we consider Orders 5254 and 5309 to be preliminary procedural orders of the agency because, under the latter, the validity of the first order was to be the subject of an administrative review and a final determination on that very issue. Cf. R. F. C. v. Lightsey, 2 Cir., 185 F.2d 167; Federal Power Com. v. Metropolitan Edison Co., 304 U.S. 375, 383, 384, 58 S.Ct. 963, 82 L.Ed. 1408. Most practical considerations call for this conclusion. Great emphasis is laid on the injury to Association that would result from pursuit of the tendered administrative remedy, but this concept runs counter to the well settled rule that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted, and this is true though it be asserted (as here) that the mere holding of the prescribed administrative hearing would result in irreparable damage. See Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50–51, 58 S.Ct. 459, 82 L.Ed. 638; Macauley v. Waterman S. S. Corp., 327 U.S. 540, 544, 545, 66 S.Ct. 712, 90 L.Ed. 839; Goldsmith v. U. S. Board of Tax Appeals, 270 U.S. 117, 123, 46 S.Ct. 215, 70 L.Ed. 494;

Federal Power Commission v. Arkansas Power & Light Co., 330 U.S. 802, 67 S.Ct. 963, 91 L.Ed. 1261. See also pre-Administrative Procedure Act comments in 51 Harvard Law Review, p. 1251 and Yale Law Journal, Vol. 51, No. 7, p. 1093. These cases and comments highlight the doctrine announced in Fahey v. Mallonee, supra. (We have previously called attention to several of the above noted cases in Footnote 7.)

■ The doctrine of exhaustion of administrative remedies requires not merely the initiation of prescribed administrative procedures; it requires pursuing them to their appropriate conclusion and awaiting their final outcome before seeking judicial intervention. Such is the view expressed by the Supreme Court in Aircraft & Diesel Equipment Corp. v. Hirsch, 331 U.S. 752, 767, 67 S.Ct. 1493, 1500, 91 L.Ed. 1796, where it goes on to point out "The very purpose of providing either an exclusive or an initial and preliminary administrative determination is to secure the administrative judgment either, in the one case, in substitution for judicial decision or, in the other, as foundation for or perchance to make unnecessary later judicial proceedings."

Enough has been said in Fahey v. Mallonee, supra, respecting the delicate nature of the banking business to justify the actions of Administration. The lower court erred when it completely thwarted the entire administrative process without justification in law by its injunctive order of July 1, 1946.

### The Administrative Procedure Act

What we have said respecting the necessity for resort to an exhaustion of administrative remedies requires a reference to the effect of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq. which became law during the early period of this litigation. We hereafter refer to this Act as A.P.A. It was approved on June 11, 1946 and so far as related to material issues in the Mallonee-Association bracket of the litigation its "effective date" was September 11, 1946. Since the Federal Home

Loan Bank Board and/or Administration is clearly a federal administrative agency the existence of this legislation posed a question as to whether its provisions were applicable to "pending suits." (We here refer only to the suits of the Mallonee-Association group of litigants and not the Los Angeles action.)

On November 5, 1947, when numerous parties were before the court on certain motions, the court asked counsel whether A.P.A. was *then* applicable in connection with proceedings by Administration. The answer shed no light on the problem and the matter was dropped without further consideration at that time.

Further discussion occurred in November, 1949 during which the lower court expressed its views about the applicability of A.P.A. It said: "The fact is that the A.P.A. has been passed, and nobody has claimed that the Board, whatever you call it, the Home Loan Bank Board, and the various agencies involved are not subject to the A.P.A. At the time the A.P.A. became effective this suit had been filed." The court further stated that Orders 5082, 5083 and 5084, and 5254, were separated from the administrative procedural requirements of A.P.A. prior to their promulgation but in any event it now has jurisdiction to review these orders under Section 10 of A.P.A.; that Justice Jackson "specifically states in his opinion [Fahey v. Mallonee] that the opinion is reached without reference to reviews under the Administrative Procedure Act."

Specifically referring to Order No. 2015 the court stated that if the Board's actions were official actions, then the court has jurisdiction to review them under A.P.A.— if the actions were not official in character, that question cannot be determined until the trial of this case on its merits "because one of the grounds of invalidity is alleged [in the 1947 amendments] to be that the acts of the then Board were invalid because of fraud, malice and the like, which cannot be official acts."

It was during this discussion that counsel for the Board urged that A.P.A. exempted from judicial review *preliminary*

orders of an administrative body and this exemption would include *orders setting a case for hearing*. Counsel for Mallonee countered with the argument that Order No. 2015 "endeavors to revive the former charges, the very subject matter of this litigation which has been before your Honor for a matter of some three years."

On this appeal Mallonee argues that *all* of the orders of Administration which led to this litigation (including the three orders affecting Los Angeles) were judicially reviewable *final* administrative agency acts within the purview of Section 10(c) of A.P.A. This argument includes Order 5254 which appointed Ammann as Conservator of Association, the validity of which appointment is still undecided. It seems clear that on this appeal Mallonee adopts the view that after its effective date, A.P.A. applied to the agency issuing that order. If this is the position of Mallonee we agree. But in this connection we make plain that we regard Order 5254 as purely preliminary and procedural in character, for the reasons previously indicated.

Appellants do not here argue the question of the applicability of A.P.A. save and except in a limited way. As to Los Angeles they argue that control over Federal Home Loan Banks *is committed by the terms of the statute* to the sole discretion of the administrative agency, and orders made by virtue of this statutory control are not subject to judicial review or to judicial remedies "even if A.P.A. is applicable to this case." It is also suggested by appellants that A.P.A. is *probably* inapplicable to any action *pending* prior to September 11, 1946 (Section 12), and "even if applicable, all sub-sections of Section 10 are subject to its introductory clause, 'except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion,' a qualification which, as its legislative history shows, was intended to include *implied limitations* as well as those expressly provided by statute." Appellants also point out that the Supreme Court has decided all cases involving judicial review under Section 10[16] without indicating if A.P.A. is applicable to suits pending on its effective date.

However, a number of recent cases support the conclusion that legislation of the character of the A.P.A is to be regarded as "remedial" and "procedural" and therefore applicable to pending actions. See Wong Yang Sung v. McGrath, 339 U.S. 33, 44, 45, 70 S.Ct. 445, 94 L.Ed. 616; National Labor Relations Board v. Pittsburgh S. S. Co., 340 U.S. 498–500, 71 S.Ct. 453, 95 L.Ed. 479; Pittsburgh S. S. Co. v. N. L. R. B., 6 Cir., 180 F.2d 731, 733; Ex parte Collett, 337 U.S. 55, 71, 69 S.Ct. 944, 93 L. Ed. 1207. See also 50 Am.Jur. "Statutes" Sec. 482. We agree with the rationale of these cases and hold that *after* September 11, 1946 the effective provisions of A.P.A. were immediately applicable to the pending suits of the Mallonee-Association group of litigants. Cf. Barber v. Yanish and Diaz, 9 Cir., 196 F.2d 53.

The trial court should *then* have refused to longer entertain the Mallonee-Association actions, and it erred when it failed to immediately dismiss them on the ground that tendered and available administrative remedies were not first exhausted. Failure of the court to dismiss these actions after September 11, 1946 merely compounded the original error of the court in entertaining them at the outset of the litigation. On September 11, 1946, the litigation was still in its initiatory stage and still free of the aftermath of complications caused by the later numerous interpleader and intervention actions to which we have previously adverted, and at this point we strongly emphasize that at that time prompt and final disposition of the conservatorship issue by securing through the administrative process a final and judicially reviewable order or determination on the issue of the

16. United States v. Ruzicka, 1946, 329 U.S. 287, 67 S.Ct. 207, 91 L.Ed. 290; Board of Governors of the Federal Reserve System v. Agnew, 1947, 329 U.S. 441, 67 S.Ct. 411, 91 L.Ed. 408; Krug v. Santa Fe Pacific Rd. Co., 1947, 329 U.S. 591, 67 S.Ct. 540, 91 L.Ed. 527; Patterson v. Lamb, 1947, 329 U.S. 539, 67 S.Ct. 448, 91 L.Ed. 485.

validity of the conservatorship, would have then laid that issue at rest thereby disposing of the one great controversy which inspired the Mallonee-Association bracket of this litigation. The parties who were bitterly assailing the Ammann appointment and challenging its validity then had a chance, after the A.P.A. became effective, to sweep away all doubts by a method which would have produced prompt results. For reasons which lack appeal, the case was continued in its former posture.

█ Upon the whole record we are fully convinced and therefore hold that procedure in the lower court subsequent to the injunction order of July 1, 1946 (including the amendment of the Mallonee and Association pleadings under the order of November 10, 1947) did not have the legal effect of vesting jurisdiction in the lower court to entertain these actions after September 11, 1946. And in order that our position may be made plain we hold that any final determination of Administration on the validity of the Ammann appointment reached *after* the effective date of A.P.A., and as the culmination of the administrative process approved in Fahey v. Mallonee, supra, would have been judicially reviewable under the procedural requirements of A.P.A.

### IV

The specific issue presented on this appeal is the challenge of appellants to the propriety and validity of a Preliminary Injunction entered by the lower court on December 1, 1949 which, inter alia, restrained and enjoined the Home Loan Bank Board and its agents and servants, and any and all of the appellees, "and all other parties," from interfering in any way with this litigation or in any way participating in an administrative hearing ordered by the Board by its Order No. 2015 dated September 9, 1949, or adjournments thereof, or restoration of hearing date thereon. The order of injunction was so sweeping in character that it enjoined almost any possible form of activity

related to the administrative hearing matter but by its terms it permitted a continuance of efforts of the parties looking to a "compromise or settlement" of the litigation, "or parts thereof."

As respects this particular injunction order Los Angeles correctly insists that the issues in the Los Angeles action have not been adjudicated by the lower court. It represents to us that it is not directly concerned with the subject matter of this appeal because the decision we must reach will not be dispositive of the issues confronting it and its co-plaintiffs. For reasons later stated, we agree with this contention.

As the dates indicate, the injunction on appeal was issued nearly three and one-half years after the original injunction of July 1, 1946. During this intervening period (which we here consider) the lower court was confronted with and compelled to pass upon and decide, a vast array of complicated and collateral issues which had been finally injected into the litigation and arose largely out of the tangled affairs of Association as the product of the conservatorship. These matters have been detailed at some length in Part II herein. Brief reference to these intervening procedural activities is necessary since they have a bearing on the injunction of December 1, 1949. References to the *Board* in this part of our opinion mean the Home Loan Bank Board, successor to the former Home Loan Bank *Administration,* the two so designated being the same federal administrative agency. (See Footnote 3.)

On or about November 29, 1947, Association and Mallonee filed a "protest" with the (then) *Board* requesting a postponement of another administrative hearing dealing with the affairs of Association, which hearing had been set for December 15, 1947. Thereafter the Board indefinitely postponed this hearing.[17]

The contentions set forth in the 1947 "protest" of Association are in themselves an illuminating comment on the confusing

---

17. After the lower court had entered its injunction order of July 1, 1946, the then Federal Home Loan Bank *Administration* did not rescind its Order No. 5309 of June 5, 1946 by which it had ordered and directed that an administrative hearing be held on July 3, 1946 at Los Angeles, California. (See text of

and vexatious results which followed the first injunction against resort to the administrative process, and they are here urged as a sound reason why the court should again employ the injunctive process for the same purpose.

In its 1947 "protest" Association presents a picture of this litigation as it stood in December of that year. It urged, inter alia, that such an administrative hearing "would be unable to determine all of said issues and in fact *could determine but a tiny fraction of the issues which have arisen since the year and a half which has elapsed since the date of the Long Beach [Association] seizure."* Association also asserted that as a direct and proximate result of the appointment of Ammann as Conservator of Association the titles to the homes of 8,000 borrowers of Association "have become hopelessly entangled, enmeshed, clouded and impaired and said home owners, even upon payment in full of the amount borrowed from Association are unable to obtain a clear or marketable title; and said borrowers have been compelled to, and have, intervened in said court proceedings * * * [and] that in order to obtain a clear title to their homes, *all remaining borrowers will be likewise compelled to intervene in said action."* That "the conducting of an administrative hearing at any time prior to said court adjudication would only unnecessarily duplicate all of the complex proceedings, expenses and delays."

On January 17, 1948 the Board adopted and ordered delivered to the lower court its Resolution No. 388, [18] which among other

Order 5309 in Footnote 10.) At a hearing on November 10, 1947 at which hearing the lower court had authorized Mallonee and Association to amend their original pleadings so as to charge Administration with fraudulent conduct in the issuance of the various orders affecting Association (see discussion re this hearing in Part 2) the court considered the effect of the decision in Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L. Ed. 2030, and concluded that the mandate of the Supreme Court in that case vacated both the original restraining order of July 1, 1946 and the similar restraining order approved by the three Judge-Court, the decision of which was before the Supreme Court in the Fahey case.

At the hearing of November 10, 1947, appellants submitted an order which dissolved the injunction in conformance with the mandate of the Supreme Court and the record indicates that the lower court thereupon signed this order. It appears to be the view of appellants that this order dissolving the noted injunction had the result of leaving Order No. 5309 unimpaired. From the record it also appears that the (then) *Board* thereafter notified Association that an administrative hearing re "appointment of Conservator for Long Beach Federal Savings and Loan Association, Long Beach, California" will be "resumed at 10 o'clock in the forenoon on Monday, the 15th day of December, 1947". From the record it appears that Association thereupon "amended" its original 1946 request for such a hearing and in this amended request asked the three Board members of Administration, and Administration, "to postpone any and all hearings (under Order No. 5309) until such time as the matters pending in the Federal Courts have been tried and adjudicated and to only hold such hearings if such Federal Court proceedings after final adjudication prove unable to completely decide, determine and remedy the complex situations only partly above outlined."

Mallonee joined Association in petitioning Administration to cancel the said proposed hearing set for December 15, 1947, and requested that Mallonee and Association be advised sufficiently in advance of said hearing as to the Board's action in order that they might take appropriate action to protect the interest of the shareholder members represented by Mallonee.

In the findings attached to the Preliminary Injunction now on appeal the lower court recites that the aforesaid "protests" of Mallonee and Association were granted by Administration, and the administrative hearing set for December 15, 1947 was, by the Home Loan Bank Board, postponed indefinitely.

18. "No. 388, Date January 17, 1948

"Be It Hereby Resolved that the Federal Home Loan Bank Administration Order No. 5254 appointing a Conservator for the Long Beach Federal Savings and Loan Association be and the same is hereby rescinded, such rescission to become effective upon the request of the

things rescinded previous Order No. 5254 which had appointed a Conservator for Association. (See text of Order 5254 in Footnote 2.) On petition of Mallonee and Association, and more than two years after his appointment on May 20, 1946, the lower court, (on June 23, 1948) formally ordered (1) that Ammann be removed as Conservator of Association and that he render an accounting to the court, and (2) that a special election be held by the shareholders of Association at which election directors of Associai' >n be elected, this election to be held under supervision of a Special Master of the Court. This order directed that assets of Association be delivered to the officers of Association on January 24, 1948.

On September 27, 1948 the (removed) Conservator filed with the lower court the "accounting" report required by Resolution 388. As indicative of the vast number of individual matters handled by the Conservator, the findings of the lower court state that this report consisted of 600 single spaced pages with an additional inventory of 200 pages, covering approximately 150,-000 separate items. In finding No. 60 accompanying the Preliminary Injunction now on appeal the court recites that one of the issues yet to be decided in a judicial review is the *legality* of Resolution 388 "at the time of making thereof."

shareholders of said Association through their authorized representative that the assets of said Association of any and every nature whatsoever belonging to or pertaining to said Association, together with all books, records and accounts of every nature pertaining to said Association be delivered to such shareholders upon demand made through their authorized representative.

"Be It Further Resolved that the Conservator be and he is hereby authorized and directed to deliver all of the aforesaid assets, records and books of any and every nature to said shareholders through their authorized representative and to make a full and complete accounting to said shareholders for all assets and liabilities of any and every nature pertaining to said Association, and a copy of such accounting to be filed with the District Court of the United States, in and for the Southern District of California.

The next important step and the one which eventuated in the instant appeal arose in the following manner. On September 9, 1949, having received no monthly or annual reports from Association since the removal of the Conservator, the Home Loan Bank Board, by Order No. 2015 directed an investigation and hearing to be held to determine what appropriate administrative action, if any, should be taken, including possible appointment of a receiver. The material parts of this order read as follows:

"Whereas it appears to the Home Loan Bank Board that:

"1. The Long Beach Federal Savings and Loan Association, Long Beach, California, has failed to file the monthly and annual reports required by the Rules and Regulations for the Federal Savings and Loan System;

"2. Said Association has failed and refused to furnish an affidavit of its president or secretary or other officer that, to the best of his knowledge and belief, the books of said Association correctly reflect the financial condition thereof, as required of all Federal savings and loan associations;

"3. Said Association has failed to pay the premiums for insurance of its accounts and the installments there-

"Be It Further Resolved that the Conservator be, and he is hereby directed, to make available for inspection at the office of the Association all of the records and books of said Association to counsel for the Shareholder's Committee or an agent of the shareholders of said Association, or to a representative of the District Court of the United States, in and for the Southern District of California, Central Division.

"Be It Further Resolved that a certified copy of this resolution be forthwith delivered to the above named Court and to counsel for each of the parties of record in actions numbered 5254 P. H. and 5678 (WM) P H in said Court, except counsel for Intervenors in said actions, and that a copy be furnished to the Conservator.

 * * * * * *

"By the Home Loan Bank Board

"J. Francis Moore,
"Secretary."

on due and payable on or about June 5, 1948, December 5, 1948, and June 5, 1949, in the total amount of $36,487.25, in violation and disregard of the statutes of the United States, the Rules and Regulations for Insurance of Accounts, and its contract with the Federal Savings and Loan Insurance Corporation;

"4. Said Association and its officers have committed and are committing other violations of law and regulations, including violations set out in the More Definite Statement submitted to said Association on May 29, 1946, and having pursued and are pursuing a course that is jeopardizing and injurious to the interests of its members, creditors, and the public;

"It Is Hereby Ordered, pursuant to the authority vested by law in the Home Loan Bank Board and pursuant to the Rules and Regulations for the Federal Savings and Loan System, that the Long Beach Federal Savings and Loan Association, Long Beach, California, appear at a hearing, as hereinafter provided, and show cause, if any it have, why the Home Loan Bank Board should not, for the reasons hereinbefore stated, enter its order or orders for such action as it deems necessary or appropriate, including the appointment of the Federal Savings and Loan Insurance Corporation as receiver for said Association."

On motion of five appellees, Mallonee, Association, Title Service Co., Wallis and Turner, the lower court promptly restrained the holding of this Board hearing for 10 days by an ex parte order entered on October 18, 1949. This restraining order was continued in force by a subsequent order entered on October 28, 1949. After further hearings on November 8th and 9th, 1949, the restraint upon the administrative hearing was ultimately continued by the Preliminary Injunction from which this appeal is taken.

The findings which accompany this Preliminary Injunction were formulated at a separate ex parte hearing held on November 11, 1949 from which government counsel was expressly excluded and at which all issues of fact and law bearing on the merits of the case were fully canvassed.

The temporary restraining order issued by the court on October 18, 1949 clearly reveals the grounds upon which the court relied to justify the Preliminary Injunction of December 1, 1949. This temporary restraining order occupies many pages of the record and its pertinent recitals constitute an additional chapter in the history of this involved litigation. In this order the lower court frankly states that it still faces the necessity of "reviewing" (the) five early orders of the Board which precipitated this entire litigation, in addition to Resolution No. 388 above referred to; that Order 2015 is the sixth of such orders and, on its face, interferes with, obstructs, and if proceeded with would or may nullify the orders, process, and jurisdiction of this court presently operating and effective, in review of said five prior orders. The court further recites that the five *orders* preceding Order 2015 purport to be final and conclusive on their face.

As one of the reasons for issuing its order restraining the holding of an administrative hearing under Order 2015 the court recites that its process and powers are available to the Board to protect and preserve the public interest and rights involved in, or necessarily collateral to, this litigation, and to compel the performance of any alleged unfulfilled duty of said Association, or any other litigant herein, as well as to protect and preserve the assets and rights of the shareholder members and depositors and borrowers from, and other persons doing business with Association. It formally concluded that an administrative hearing "could not determine or pass upon *all* of the issues or parties *now* before this court."

In this order, the court also points out, that this litigation is now at issue except for certain motions. It heavily stresses the fact that certain representations and statements had been made to the court by

parties to the litigation that this litigation was about to be, or had the probability of being settled and compromised without the delay and expense of protracted litigation which was involving institutions and public officers, boards and bodies dealing in and with the private funds of the public. The court further recited that no delay in the prosecution of any of the phases of this litigation was due to actions of appellees since appellees had vigorously and diligently prosecuted and maintained this action in these proceedings, and the elapsed time, during which active litigation was suspended, was caused by negotiations for settlement and compromise of the entire litigation, these efforts being reflected in 44 major conferences and numerous minor conferences.

From this portrayal it would seem that the contending parties have so far been unable to reach an acceptable compromise which would, or could possibly, unscramble and finally settle the involved and bitterly contested issues of law and fact in this long controversy.[19] It may also be noted that a tenable basis for a "compromise" which would be within the law is not suggested by the lower court. At least one thing is clear—Association finds nothing in this particular stalemate which can be attributed to the enjoining of resort to the administrative process at any stage of the litigation.

Counsel for one of the parties pointed out to the court that nobody could be compelled to settle this controversy which has dealt with money that belongs to many people other than the named parties to the lawsuit. The lower court answered this suggestion by stating (on December 19, 1949) that:

"The only one here in all of this litigation who has ever shown up who actually was an immediate and direct representative of somebody whose money was involved was Mr. Westover and his Committee [Mallonee]. At least he has three clients who have some money in the bank down there, or whatever you call it. Everybody else is fighting over powers and rights and duties and obligations and Government regulations, etc.

\* \* \* \* \* \*

"It seems to me that the parties who have been appearing here in court are merely representatives of somebody else. It might well be that these unnamed people, many of them probably don't know they are in court, some of them perhaps, if they were given an opportunity actually to see a proposal of compromise in this litigation and actually to express themselves on that proposal might by vote direct the people who are their representatives to accept it."

We have heretofore noted the provisions of Order 2015 before us on this

19. In Finding No. 23 which accompanies the preliminary injunction now on appeal the lower court states that negotiations for the compromise of *all* of this litigation were actively engaged in by some or all of the parties, including defendants Home Loan Bank Board, its members, et al., immediately following the restoration of Association by order of this court January 23, 1948, and that said settlement negotiations proceeded thereafter at times intermittently, and during the year 1949, almost continuously. That in reliance upon repeated representations made to this court by *all parties*, the court has not acted upon many of the motions and things, which were pending and which concerned or may have affected the main issues in litigation, in order to enable parties to conduct their negotiations for settlement, and settle, if possible, this litigation which, except for the public interest, involves ultimately, the rights of individual persons, whose money is entrusted to public depositories either directly or indirectly.

This finding of the court apparently explains why the court had not (up to December 1, 1949) adjudicated the merits of the contentions in the Los Angeles suit. It is obvious that pending this appeal the status of the Los Angeles case in the lower court will remain unchanged. Reference is made to Footnote 10 of paragraph 23 of the aforesaid court findings.

appeal. In this order for a hearing the Board makes serious charges against Association and we do not doubt that under the law, and under the rules and regulations of the Board which deal with its supervisory power over such institutions as Association, it may lawfully and properly require Association to answer these charges *in the manner and under the conditions prescribed in this administrative order.* The authority of the Board to require compliance with an administrative order of this character seems clearly spelled out in the holding of the Supreme Court in Fahey v. Mallonee, supra, and we hold that in issuing the said order the Board validly exercised a power of supervision lodged in it.

But Association undertakes to justify the preliminary injunction now on appeal upon a great many grounds. Among these it urges that dilatory pleas as to jurisdiction should be laid to rest and the litigation proceed to an adjudication on the merits. It assails Order No. 2015 as "government by administrative fiat" and asserts that Association and the rights of its depositors, stockholders and creditors may exist only at the pleasure or whim of appellants if this order is valid. Answering appellants' contention that all of this litigation is premature because the appellees have not exhausted their administrative remedy, Association avers that there was no administrative remedy to exhaust *when in December of 1947* appellants heeded the protests of Mallonee and abandoned the administrative hearing then set and thereafter made a general appearance in January of 1948 and also rescinded the order appointing Ammann as Conservator.

It is claimed by Association that in May of 1948 when Association filed its amended cross-claim, there was no administrative remedy available to any litigant as to any of the issues *then submitted and pending before the court.* In short, Association's view is that appellants could not adopt an administrative order in 1948 which submitted the issues to the court for decision and thereafter adopt Order No. 2015 withdrawing from the court the very issues previously submitted. In other words appellants cannot appoint a conservator in 1946, remove him in 1948 and suffer a final judgment of removal by the Federal Courts only to reappoint another conservator or receiver in 1949, this after appellants had been charged with fraud, malice and bad faith. Such a course of procedure, says Association, would completely frustrate and nullify the A.P.A. and this is the correct view of the law *regardless* of what may have been the original status in 1946 of the judicial proceedings being reviewed on this appeal.

Association also asserts that "our present Mallonee Fahey case has not yet been fully decided on *all* of the merits * * * the decision on the merits of necessity will decide the jurisdiction of the Court." Association also avers that "in our appeals, we have the overwhelming multiplicity of actions by the home owners to clear their titles" and "relief to clear California titles is completely beyond the power of any court at Washington, D. C. * * * any judgment made by the District Court in Washington, D. C. would have no effect in rem on the titles to, or the possession of the thousands of notes, deeds of trust, government bonds, cash, bank accounts and securities, making up the $70,000,000 originally seized from the Los Angeles Bank and Association." Order No. 2015 "is their [Board's] attempt to seize for the second time appellee Association, this time for the purpose of liquidation * * * in essence, if Association gave the required monthly report, Association would have abandoned the litigation, waived its damage claims and accepted Ammann's accounting as correct, all to the damage and detriment of Association and its depositors, to the extent of many millions of dollars."

Association also urges that by Order No. 2015 appellants seek to appoint themselves as receivers for the liquidation of the litigation against themselves and thereby to vacate the prior final judgment of the lower court which removed their agent from possession of Association. It winds up its condemnation of Order No. 2015 by averring that "ignorance of the consequences of the first confiscation [of Association]

cannot be pleaded as an excuse for the consequences threatened by the second attempted confiscation, * * * yet their [appellants'] only defense in resisting the preliminary injunction on appeal was an attack on the jurisdiction of the court below." Association demands that the preliminary injunction on appeal be affirmed and the cases remanded for a trial on the merits of the remaining issues.

In restraining the holding of an administrative hearing under Order No. 2015 the court invokes a provision of A.P.A. and finds that the hearing is in contravention of the terms of that Act, Section 1004(a) of Title 5 U.S.C.A., since the hearing is to be held "without due or any regard for the convenience of the parties and for their representatives, and are unreasonable, inconvenient to the parties and counsel and witnesses." It further finds such a hearing would "impose upon, interfere with and supplant the jurisdiction of this Court to determine some or all of the main issues in the entire litigation, as well as some or all of the * * * preliminary issues." In this reference the court indicates that it embraces matters which have been in issue in some of the numerous motions and proceedings heretofore had upon which final appealable orders have been made and as to many of which the time for appeal has expired.

In its Finding No. 56 the court revives an early argument of Mallonee and voices doubt as to whether or not the numerous parties litigant in the pending actions who are not designated as parties to the said hearing under Order 2015 would be permitted to intervene or take part therein, all of which would be to their prejudice.

In Finding No. 34, the court states that to require the hearing to be held in Washington, D. C. would force the parties, counsel and witnesses to travel 3000 miles with records and documents, all of which would constitute a needless burden, a needless duplication of trial process and a multiplicity of actions.

 As respects Order No. 2015 we are convinced that if, in the light of this whole record and on the showing here made, the statutory authority of the Board to issue and enforce such an order made pursuant to and under the provisions of its rules and regulations, may be disregarded and set at nought by the instant injunction (as Association now demands and the lower court holds) the Board would find itself powerless to correct and/or eliminate what it considered and here formally charged to be flagrant managerial abuses involving fiduciary duties and obligations. The fact that Order 5309 had been previously rescinded did not deprive the Board of all authority to later direct that another administrative hearing be had on a set of charges subsequently laid against Association and its management. Such an order of rescission cannot work an estoppel against subsequent action of the Board under any tenable theory of law applicable to decisions of administrative tribunals. For comments upon this phase of the law see Pearson v. Williams, etc., 202 U.S. 281, 284, 285, 26 S.Ct. 608, 50 L.Ed. 1029; Churchill Tabernacle v. Federal Communications Commission, 81 U.S.App.D.C. 411, 160 F.2d 244; Segal v. Travelers Ins. Co., D.C., 94 F.Supp. 123 and cases cited in these opinions.

 Nor can it be said that because a previous administrative hearing under Order No. 5309 was enjoined (under circumstances revealed by the record) the court retains a continuing power and authority to enjoin any and all subsequent administrative hearings which may be called by the Board on a later set of charges laid against its management simply because some of these subsequent charges may relate directly or indirectly to certain of the matters involved in the original hearing or hearings called under Order No. 5309.

If such is the law the supervisory powers vested in the Board under Section 5(d) of the Home Owners' Loan Act of 1933, as amended, would be meaningless and illusory because they could be frustrated and thwarted by a mere assertion that "property rights" were being jeopardized or destroyed. As applied to Association, it would also mean that the management of

Association would be free to go on undisciplined and unchecked in any course it chose to follow simply because its officers had, at some prior time, successfully resisted a demand that they then answer charges of mismanagement in an administrative hearing called by the Board. The purpose and theory of administrative review of agency orders is to secure a final administrative order or "determination" which, as to that particular controversy, wraps the issues in one package so that a judicial review of the final administrative determination will conclusively end that controversy. This litigation affords a striking example of the confusion which may follow repudiation of this well recognized process.

· The Home Owners' Loan Act of 1933, as amended, gives the Board a wide area of supervisory control over institutions like Association and its extensive powers in this field were given the strongest emphasis in Fahey v. Mallonee, supra. And it is to be noted that despite the recommendations of a Congressional Committee·in a report made on July 25, 1946, Congress has not seen fit to amend that statute so as to curtail the supervisory powers of the Board.[20] Furthermore, the nature of Order 2015 clearly reveals that a final determination of the Board is to be arrived at after the administrative hearing under Order 2015. It is obvious that such a final determination

would have to rest upon and be supported by substantial evidence adduced to prove the charges laid by the Board. The issues here raised as to the illegality of such a hearing would, of necessity, be the controlling factor in shaping the final and judicially reviewable determination of the Board on that issue. The presently involved state of the record which resulted from failure to exhaust the administrative remedy in the initiatory stage of this litigation thereby causing this litigation to fan out and proliferate into its present complications provides no sound reason in law for another judicial repudiation of a procedure clearly authorized under law and the rules and regulations of the Board. The answer to the unhappy and regrettable involvements of this long drawn-out and costly litigation is not to be found in a further resort to a court injunction to completely thwart an administrative process which Congress has seen fit to approve.

### The Issue as to Los Angeles

Los Angeles specifically disclaims any immediate interest in the outcome of the instant appeal. It insists that the purpose of the instant appeal is to challenge the legality of the injunction issued on December 1, 1949, which enjoined an administrative hearing under Order No. 2015 which threatens the appointment of a receiver for Association and therefore only affects As-

---

**20.** Association and Mallonee have favored us with a pamphlet containing a report of the Committee of the House of Representatives issued in the 79th Congress, 2nd Session, bearing date of July 25, 1946 (House Report No. 2659). This report dealt with complaints lodged with the Committee to Investigate Executive Agencies in connection with the affairs of Los Angeles and Association. The Committee ·made certain recommendations which are made part of the Report. This report was issued almost a year before the decision in Fahey v. Mallonee, supra, and of course the Committee members could not foresee the conclusions reached by the Supreme Court in that case. As an example, the Committee questions whether the law ever contemplated that the administrative officials here involved should have "the extraor-

dinary power to seize and appoint a conservator * * *." The Committee recommended consideration by appropriate committees of Congress of the necessity (if any) of amending the Federal Home Loan Bank Act but it is not indicated by any of the parties that such recommendations were acted upon by Congress. It also recommended that the Commissioner (Fahey) revoke the order appointing a Conservator for Association. We have referred to this Committee report for the reason that counsel for appellees feel that it has some bearing on the issues now before us. It is a rational assumption that the holding of the Court in Fahey v. Mallonee and the existence of the APA satisfied Congress that adequate remedies were at hand to meet a situation described by the Committee.

sociation. Federal Savings and Loan Association of Wilmington (a co-plaintiff in the Los Angeles action) advises us that while the direct effect of this hearing is of no concern to it, the hearing would have "interfered" with the assets of the Los Angeles Bank in which Wilmington is a stockholder and in which it has a vital interest. For this reason it voices formal opposition to the hearing.

The argument of Los Angeles accords with that advanced by appellants who assert that the subject matter for hearing (under Order 2015) bears no relation to the subject matter of the Los Angeles action because the Board order in question relates only to the affairs of Association, while the Los Angeles action is concerned exclusively with the validity of the three orders of March 29, 1946 consolidating the reserve banks of the former Eleventh and Twelfth Districts.

Appellants point out that the pending Mallonee action is also concerned with damages arising out of the asserted *invalidity* of the original order of May 20, 1946 appointing a Conservator for Association, while the Board order of September 9, 1949 (involved on this appeal) *concerns the current operations of Association and the possibility of taking corrective action in the future,* that is to say, the object of the enjoined administrative investigation and hearings is to determine what, if any, administrative action is presently necessary in connection with Association.

These arguments are valid and must prevail. We therefore hold that any question raised on this appeal, with reference to basic jurisdiction of the lower court to hear and determine the Los Angeles case, (including co-appellee Federal Savings and Loan Association of Wilmington) is not properly before us and is irrelevant to the subject matter of the present appeal which is: Did or did not the lower court err, whether for want of power or otherwise, in granting an injunction which related only to the subject matter of the Mallonee, or Association case? In this view of the case, and only for the reasons stated, we deny the prayer of the appellants that the suit of Los Angeles, now pending in the lower court, be dismissed. (See reference to present status of Los Angeles Action in Footnote 19.)

Upon consideration of the whole record we conclude that the order of the lower court dated December 1, 1949, which restrains and enjoins the holding of an administrative hearing called pursuant to the provisions of Order No. 2015 of the Home Loan Bank Board, dated September 9, 1949, was erroneously issued. It is therefore ordered that the said order for Preliminary Injunction be, and the same is, hereby reversed, and the court below is directed to vacate and set aside the said injunction.

STEPHENS, Circuit Judge (concurring).

I agree with Judge BONE'S conclusions as detailed in his exhaustive review of this super-complicated litigation and join in the order contained in the last paragraph of the opinion. The whole subject matter from the beginning presented highly difficult legal questions, solvable in certainty only by the court with the last say. I thoroughly agree that Fahey v. Mallonee, 1947, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030, must be followed as indicated in the main opinion.